### United States v. Forty-three Gallons of Whiskey, etc.

1. Congress, under its constitutional power to regulate commerce with the Indian tribes, may not only prohibit the unlicensed introduction and sale of spirituous liquors in the "Indian country," but extend such prohibition to territory in proximity to that occupied by Indians.
2. It is competent for the United States, in the exercise of the treaty-making power, to stipulate, in a treaty with an Indian tribe, that, within the territory thereby ceded, the laws of the United States, then or thereafter enacted, prohibiting the introduction and sale of spirituous liquors in the Indian country, shall be in full force and effect, until otherwise directed by Congress or the President of the United States.
3. Such a stipulation operates *proprio vigore*, and is binding upon the courts, although the ceded territory is situate within an organized county of a State.

Error to the Circuit Court of the United States for the District of Minnesota.

This is a libel of information by the United States against

forty-three gallons of whiskey, sundry peltries, and other goods and merchandise, seized as forfeited by virtue of the twentieth section of the act of Congress approved June 30, 1834, as amended by the act approved March 15, 1864.

There are two special counts in the libel. The first, in substance, sets forth, that on Feb. 12, 1872, Bernard Lariviere, a white person, of the village of Crookston, in the county of Polk, and State of Minnesota, did unlawfully carry and introduce into said village, which is located upon the territory ceded to the United States by treaty with the Red Lake and Pembina bands of Chippewa Indians, made and concluded Oct. 3, 1863, and proclaimed May 5, 1864, the spirituous liquors particularly described, contrary to the treaty and the act of Congress above cited; that an Indian agent, duly appointed, having reason to suspect, and being informed, that spirituous liquors had been introduced by said Lariviere into said county of Polk in violation of the act of Congress, searched and caused to be searched the goods, merchandise, peltries, &c., which he had in his possession at Crookston, in the ceded territory aforesaid: upon which search the whiskey was found stored, packed, and mingled with and in the packages, goods, and peltries, and in the places of deposit of said Laraviere, and was so carried and introduced into the ceded territory, contrary to the form of statute of the United States in such case made and provided, and was seized and taken by the Indian agent as forfeited, together with all the goods and peltries, &c., so found.

The second count sets forth that the whiskey was introduced with the intent to sell, dispose of, and distribute the same to and among the bands and tribes of Chippewa Indians who frequented the village of Crookston, and lived under the charge of an Indian agent upon a reservation near that place.

The information prays that the said goods, merchandise, peltries, &c., may be decreed and declared forfeited, and the forfeiture properly enforced.

Lariviere, a claimant, who first appeared in response to the monition, demurred and excepted to the libel, upon the ground that it appeared, from its recitals, that the court had no jurisdiction; that the property never was introduced, nor was it

intended to be introduced, into any Indian country ; but that it was affirmatively shown by the libel that it was searched and seized at Crookston, in the county of Polk, and State of Minnesota, the same being an organized county, and said Crookston not being in or adjoined to or near any Indian country : hence, that the seizure was without any authority of law, &c. Grant, another claimant, also excepted and demurred, because it appeared in the libel that the goods were seized within the jurisdiction of the State of Minnesota, and not on any lands within any Indian country, or in any country exclusively within the jurisdiction of the United States.

The court below sustained the demurrer and exceptions, and dismissed the libel.

The United States thereupon sued out this writ of error.

The act of March 15, 1864 (13 Stat. 29), is as follows : —

"*Be it enacted, &c.,* That the twentieth section of the ' Act to regulate trade and intercourse with the Indian tribes, and to preserve peace on the frontiers,' approved June 30, 1834, be, and the same is hereby, amended, so as to read as follows, to wit : —

" ' SECT. 20. *And be it further enacted,* That if any person shall sell, exchange, give, barter, or dispose of any spirituous liquors or wine to any Indian under the charge of any Indian superintendent or Indian agent appointed by the United States, or shall introduce or attempt to introduce any spirituous liquor or wine into the Indian country, such person, on conviction thereof before the proper district or circuit court of the United States, shall be imprisoned for a period not exceeding two years, and shall be fined not more than $300 : *Provided, however,* That it shall be a sufficient defence to any charge of introducing or attempting to introduce liquor into the Indian country, if it be proved to be done by order of the War Department, or any officer duly authorized thereunto by the War Department. And if any superintendent of Indian affairs, Indian agent, or sub-agent, or commanding officer of a military post, has reason to suspect, or is informed, that any white person or Indian is about to introduce or has introduced any spirituous liquor or wine into the Indian country, in violation of the provisions of this section, it shall be lawful for such superintendent, agent, sub-agent, or commanding officer, to cause the boats, stores, packages, wagons, sleds, and other places of deposit

of such person, to be searched; and, if any such liquor is found therein, the same, together with the boats, teams, wagons, and sleds used in conveying the same, and also the goods, packages, and peltries of such person, shall be seized and delivered to the proper officer, and shall be proceeded against by libel in the proper court, and forfeited, one half to the informer and the other half to the use of the United States; and if such person be a trader, his license shall be revoked and his bonds put in suit. And it shall, moreover, be the duty for any person in the service of the United States, or for any Indian, to take and destroy any ardent spirits or wine found in the Indian country, except such as may be introduced therein by the War Department. And in all cases arising under this act, Indians shall be competent witnesses.'"

Art. 7 of the treaty between the United States, concluded Oct. 3, 1863, and the Red Lake and Pembina band of Chippewa Indians, proclaimed May 5, 1864 (13 Stat. 668), is as follows : —

"The laws of the United States now in force, or that may hereafter be enacted, prohibiting the introduction and sale of spirituous liquors in the Indian country, shall be in full force and effect throughout the country hereby ceded, until otherwise directed by Congress or the President of the United States."

Submitted on printed arguments by *Mr. Assistant Attorney-General Smith* for the plaintiff in error.

Trade with Indian tribes is, in all its forms, subject exclusively to the regulations of Congress. Duer's Const. Jur. 281; Rawle on the Const., c. 9, 84; 2 Story on Const., sects. 1097–1101.

The mere erection of the Territory of Minnesota into a State did not *ipso facto* cause it to cease to be "Indian country." ·*United States* v. *Bailey*, 1 McLean, 235; *United States* v. *Cisna*, id. 254; *United States* v. *Ward*, 1 Woolw. C. C. 19, 21.

The act of 1834, as amended by that of 1864, is a "regulation of commerce," and therefore within the constitutional powers of Congress. *United States* v. *Holliday*, 3 Wall. 417.

Congress, having the power to define the "Indian country," and prohibit the unlicensed introduction and sale of liquors within it, can either enlarge or diminish the boundaries of such country, as it deems best for the interests of intercourse or commerce.

Where the United States recognizes and declares the tribal condition of Indian bands, the courts will follow. *Cherokees* v. *Georgia*, 5 Pet. 1; *Worcester* v. *Georgia*, 6 id. 515.

The United States has, by treaty with the Indians, extended its laws to the territory in which this liquor was seized.

A treaty, as the law of the land, is superior to any State legislation, and is valid even as a municipal regulation, until superseded by some act of Congress. *Ware* v. *Hylton*, 3 Dall. 236; *Taylor* v. *Morton*, 2 Curtis, C. C. 454; 1 Story on Const., sect. 1838; *Worcester* v. *Georgia*, *supra*.

*Mr. M. Lamprey, contra.*

By the treaties of 1855 (10 Stat. 1165) and 1863 (13 Stat. 667), the territory upon which the goods in question were seized was transferred to the United States, and ceased to be Indian country. Within its limits the trade and intercourse laws became inoperative, for want of a subject-matter on which they could act.

The extension of those laws to an organized county in Minnesota, by force of a treaty to which the assent of that State was not obtained, is an unauthorized infringement of her jurisdiction. By the act of May 11, 1858, she was admitted into the Union, upon an equal footing with the original States. Treaties made before that date, so far as they provide that the act of 1834 shall extend to territory ceded while Minnesota was a Territory, became ineffectual after her admission into the Union. Subsequent treaties, so far as they exclude her jurisdiction over the ceded territory, interfere with her internal commerce and abridge the rights of her citizens, are an invasion of her sovereignty. A treaty which provides regulations which the Federal government cannot constitutionally impose, is to that extent without validity or binding force.

MR. JUSTICE DAVIS delivered the opinion of the court.

It may be that the policy of the government on the subject of Indian affairs has, in some particulars, justly provoked criticism: but it cannot be said, that there has not been proper effort, by legislation and treaty, to secure Indian communities against the debasing influence of spirituous liquors. The evils from this source were felt at an early day; and, in order to promote the

welfare of the Indians, as well as our political interests, laws were passed and treaties framed, restricting the introduction of liquor among them. That these laws and treaties have not always secured the desired result, is owing more to the force of circumstances which the government could not control, than to any unwillingness to execute them.

Traffic with Indians is so profitable, that white men are constantly encroaching on Indian territory to engage in it. The difficulty of preventing this intrusion, and of procuring convictions for offences committed on the confines of civilization, are the obstacles in the way of carrying into effect the intercourse laws. It is doubtless true, that they are as well executed as could be expected under the circumstances. In this case, the United States, in its endeavors to enforce them, is met with the objection, that they do not apply to the country in which the liquor was seized.

The Red Lake and Pembina band of Chippewa Indians ceded to the United States, by treaty, concluded Oct. 2, 1863, a portion of the lands occupied by them, reserving enough for their own use. The seventh article is in these words : " The laws of the United States now in force, or that may hereafter be enacted, prohibiting the introduction and sale of spirituous liquors in the Indian country, shall be in full force and effect throughout the country hereby ceded, until otherwise directed by Congress or the President of the United States." The ceded country is now part of an organized county of the State of Minnesota; and the question is, whether the incorporation of this article in the treaty was a rightful exercise of power. If it was, then the proceedings to seize and libel the property introduced for sale in contravention of the treaty were proper, and must be sustained.

Few of the recorded decisions of this court are of greater interest and importance than those pronounced in *The Cherokee Nation* v. *The State of Georgia*, 5 Pet. 1; and *Worcester* v. *The State of Georgia*, 6 Pet. 515. Chief Justice Marshall, in these cases, with a force of reasoning and an extent of learning rarely equalled, stated and explained the condition of the Indians in their relation to the United States and to the States within whose boundaries they lived; and his exposition was based on

the power to make treaties and regulate commerce with the Indian tribes. Under the articles of confederation, the United States had the power of regulating the trade and managing all affairs with the Indians not members of any of the States; provided that the legislative right of a State within its own limits be not infringed or violated. Of necessity, these limitations rendered the power of no practical value. This was seen by the convention which framed the Constitution; and Congress now has the exclusive and absolute power to regulate commerce with the Indian tribes, — a power as broad and as free from restrictions as that to regulate commerce with foreign nations. The only efficient way of dealing with the Indian tribes was to place them under the protection of the general government. Their peculiar habits and character required this; and the history of the country shows the necessity of keeping them " separate, subordinate, and dependent." Accordingly, treaties have been made and laws passed separating Indian territory from that of the States, and providing that intercourse and trade with the Indians should be carried on solely under the authority of the United States. Congress very early passed laws relating to the subject of Indian commerce, which were from time to time modified by the lessons of experience.

The act of June 30, 1834 (4 Stat. 732), as amended by the act of March 15, 1864 (13 Stat. 29), is the one now in force on this subject. It defines what shall be deemed Indian country, directs the manner in which trade and intercourse with the Indians shall be carried on, and forbids any one, under certain penalties, to give or sell liquor to an Indian in charge of an agent, or to introduce it into the Indian country.

· In *United States* v. *Holliday*, 3 Wall. 409, the power of Congress to pass the act of 1864 was the main point in controversy. Holliday was indicted for selling liquor in Gratiot County, Mich., to an Indian in charge of an agent. The county was not Indian country, nor did it even have an Indian reservation in it. It was contended, among other things, that the sale of liquor to an Indian, or any other person within the county, was a matter of State regulation, with which Congress had nothing to do. But this court held that the power to regulate commerce with the Indian tribes was, in its nature, general, and not

confined to any locality; that its existence necessarily implied the right to exercise it, whenever there was a subject to act upon, although within the limits of a State, and that it extended to the regulation of commerce with the individual members of such tribes.  It was also contended that the intercourse act was not a regulation of commerce within the meaning of the Constitution; but the court held otherwise, and said, " It (the act) relates to buying and selling and exchanging commodities, which is the essence of all commerce, and it regulates the intercourse between the citizens of the United States and those tribes, which is another branch of commerce, and a very important one."

The power is in no wise affected by the magnitude of the traffic or the extent of the intercourse.  As long as these Indians remain a distinct people, with an existing tribal organization, recognized by the political department of the government, Congress has the power to say with whom, and on what terms, they shall deal, and what articles shall be contraband.  If liquor is injurious to them inside of a reservation, it is equally so outside of it; and why cannot Congress forbid its introduction into a place near by, which they would be likely to frequent?  It is easy to see that the love of liquor would tempt them to stray beyond their borders to obtain it; and that bad white men, knowing this, would carry on the traffic in adjoining localities, rather than venture upon forbidden ground.  If Congress has the power, as the case we have last cited decides, to punish the sale of liquor anywhere to an individual member of an Indian tribe, why cannot it also subject to forfeiture liquor introduced for an unlawful purpose into territory in proximity to that where the Indians live?  There is no reason for the distinction; and, as there can be no divided authority on the subject, our duty to them, our regard for their material and moral well-being, would require us to impose further legislative restrictions, should country adjacent to their reservations be used to carry on the liquor traffic with them.

The Indian country, as defined by the act of 1834, was at that date so remote from settlements, that there was no occasion to extend the prohibition beyond its limits.  It has since then been so narrowed by successive treaties, that the white popu-

lation is now all around it, and regarding it with a wistful eye. In view of this changed condition, it would be strange, indeed, if the commercial power, lodged solely with Congress and unrestricted as it is by State lines, did not extend to the exclusion of spirituous liquors intended to corrupt the Indians, not only from existing Indian country, but from that which has ceased to be so, by reason of its cession to the United States. The power to define originally the "Indian country," within which the unlicensed introduction and sale of liquors were prohibited, necessarily includes that of enlarging the prohibited boundaries, whenever, in the opinion of Congress, the interests of Indian intercourse and trade will be best subserved.

It is true, Congress has not done this : but the Constitution declares a treaty to be the supreme law of the land ; and Chief Justice Marshall, in *Foster and Elam* v. *Neilson,* 2 Pet. 314, has said, " That a treaty is to be regarded, in courts of justice, as equivalent to an act of the legislature, whenever it operates of itself, without the aid of any legislative provision." No legislation is required to put the seventh article in force ; and it must become a rule of action, if the contracting parties had power to incorporate it in the treaty of 1863. About this there would seem to be no doubt. From the commencement of its existence, the United States has negotiated with the Indians in their tribal condition as nations, dependent, it is true, but still capable of making treaties. This was only following the practice of Great Britain before the Revolution. In *Worcester* v. *The State of Georgia, supra,* the court say, " The words ' treaty ' and ' nation ' are words of our own language, selected in our diplomatic and legislative proceedings by ourselves, having each a definite and well-understood meaning. We have applied them to Indians as we have applied them to the other nations of the earth. They are applied to all in the same sense."

In consequence of this interpretation, a country which, if left to the Indians, would have remained a wilderness, is now occupied by farms, towns, and cities. The only legitimate way to accomplish this beneficent result was by extinguishing the Indian title ; and the subject-matter of this treaty is the cession of a large tract of land in the State of Minnesota and the Territory of Dakota. Indeed, the acquisition of territory

has been the moving cause of all Indian treaties, and will continue to be so, until Indian reservations are confined to very narrow limits. It is admitted that these had the same right as other tribes to occupy their lands as long as they pleased, and that this right could only be extinguished by voluntary cession to the government. If so, why not annex to the cession a condition deemed valuable to them, and beneficial to the United States, as tending to keep the peace on the frontiers?

The chiefs doubtless saw, from the curtailment of their reservation, and the consequent restriction of the limits of the " Indian country," that the ceded lands would be used to store liquors for sale to the young men of the tribe; and they well knew, that, if there was no cession, they were already sufficiently protected by the extent of their reservation.

Under such circumstances, it was natural that they should be unwilling to sell, until assured that the commercial regulation respecting the introduction of spirituous liquors should remain in force in the ceded country, until otherwise directed by Congress or the President. This stipulation was not only reasonable in itself, but was justly due from a strong government to a weak people it had engaged to protect. It is not easy to see how it infringes upon the position of equality which Minnesota holds with the other States. The principle that Federal jurisdiction must be everywhere the same, under the same circumstances, has not been departed from. The prohibition rests on grounds which, so far from making a distinction between the States, apply to them all alike. The fact that the ceded territory is within the limits of Minnesota is a mere incident; for the act of Congress imported into the treaty applies alike to all Indian tribes occupying a particular country, whether within or without State lines. Based as it is exclusively on the Federal authority over the *subject-matter*, there is no disturbance of the principle of State equality.

Besides, the power to make treaties with the Indian tribes is, as we have seen, coextensive with that to make treaties with foreign nations. In regard to the latter, it is, beyond doubt, ample to cover all the usual subjects of diplomacy. One of them relates to the disability of the citizens or subjects of

either contracting nation to take, by descent or devise, real property situate in the territory of the other. If a treaty to which the United States is a party removed such disability, and secured to them the right so to take and hold such property, as if they were natives of this country, it might contravene the statutes of a State; but, in that event, the courts would disregard them, and give to the alien the full protection conferred by its provisions. If this result can be thus obtained, surely the Federal government may, in the exercise of its acknowledged power to treat with Indians, make the provision in question, coming, as it fairly does, within the clause relating to the regulation of commerce.

Minnesota, instead of being injured, is benefited. An immense tract of valuable country formerly withheld from her civil jurisdiction is subjected to it, and her wealth and power greatly increased. Traversed by railroads that were built, in part, at least, with lands which this treaty enabled Congress to grant, the country is open to sale and pre-emption and homestead settlement; and will soon be occupied by a hardy and industrious people. The general government asks in return for this, that the ceded territory shall retain its original *status*, so far as the introduction within it of spirituous liquors and the sale of them to the Pembina Indians are concerned.

It would seem, apart from the question of power, that the price paid by the State bears no proportion to the substantial and enduring benefits conferred upon her; and we are happy to say, that her officers are not engaged in making this defence.

*Judgment reversed, and record remanded with directions to overrule the demurrer and try the case.*