### GEARLDS et al. v. JOHNSON et al.

(Circuit Court, D. Minnesota, Fourth Division. January 9, 1911.)

### No. 1,007.

1. INDIANS (§ 35*)—INDIAN RESERVATION—INTOXICATING LIQUORS—PROHIBITION BY CONGRESS.

Congress has power, not only to prohibit the introduction of liquor into an Indian reservation, or into what is in fact Indian country, but also to prohibit the introduction of liquor into adjoining country, not in the Indian country, within the limits of an organized state.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 61; Dec. Dig. § 35.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**2. INDIANS (§ 3\*)—INDIAN LAND—CEDED LANDS—INTOXICATING LIQUORS—TREATY PROVISION—REPEAL.**

The Minnesota enabling act (Act Cong. Feb. 26, 1857, c. 60, § 5, subd. 5, 11 Stat. 167), provided that the constitutional convention should provide by clauses in the Constitution, or an ordinance irrevocable without the consent of the United States, that the state should never interfere with the primary disposal of the soil within the same by the United States, or with any regulation Congress might find necessary to make to secure the title in the soil to bona fide purchasers thereof, and that no tax should be imposed on land belonging to the United States, and in no case should nonresident proprietors be taxed higher than residents. The act admitting the state into the Union (Act Cong. May 11, 1858, c. 31, 11 Stat. 285), provided in section 1 that the state should be one of the United States of America, admitted into the Union on an equal footing with the original states in all respects, and (section 3) that from and after admission all the laws of the United States which were not locally inapplicable should have the same force and effect within the state as in other states of the Union. No reservation in favor of the Indians was made either in the enabling act, the Constitution of Minnesota, or the act admitting it into the Union. *Held,* that such act operated to repeal so much of Chippewa Indian Treaty Feb. 22, 1855, art. 7, 10 Stat. 1165, as prohibited the introduction of liquor into ceded lands within the boundaries of the state; the introduction and sale of liquor within such territory being exclusively within the police power of the state.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 5–7; Dec. Dig. § 3.\*]

**3. COURTS (§ 276\*)—FEDERAL COURTS—DISTRICT IN WHICH SUIT TO BE BROUGHT—WAIVER OF OBJECTIONS.**

An objection that defendants were sued in the wrong district was waived by their general appearance.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 815; Dec. Dig. § 276.\*]

In Equity. Suit by Edwin Gearlds and others against W. E. Johnson and others to restrain the enforcement of Chippewa Indian Treaty Feb. 22, 1855, art. 7, 10 Stat. 1165, prohibiting the introduction of intoxicating liquors into the Indian country within the entire boundaries of the country ceded by the treaty to the United States until otherwise provided by Congress. On demurrer to the bill. Overruled, and temporary injunction granted.

Spooner & Brown and E. E. McDonald, for complainants.
C. C. Houpt, U. S. Dist. Atty., for defendants.

WILLARD, District Judge (orally). Congress from time to time has passed various laws prohibiting the introduction of liquor into the Indian country. Among these are the act of 1834 (Act June 30, 1834, c. 161, 4 Stat. 729), the act of 1864 (Act March 15, 1864, c. 33, 13 Stat. 29), the act of 1892 (Act July 23, 1892, c. 234, 27 Stat. 260), and the act of 1897 (Act Jan. 30, 1897, c. 109, 29 Stat. 506), and the question at the bottom of this case is, of course, whether the United States government can prohibit the introduction of intoxicating liquors into land covered by the treaty of 1855. If the case depended alone upon these various acts of Congress, and particularly upon the last act, then no power could be found in the government for the purpose of prohibiting such introduction.

In the case of Dick v. U. S., 208 U. S. 340, the court said on page 352 (page 402 of 28 Sup. Ct. [52 L. Ed. 520]) :

"If this case depended alone upon the federal liquor statute forbidding the introduction of intoxicating drinks into the Indian country, we should feel obliged to adjudge that the trial court erred in not directing a verdict for the defendant; for that statute, when enacted, did not intend by the words 'Indian country' to embrace any body of territory in which, at the time, the Indian title had been extinguished, and over which and over the inhabitants of which (as was the case of Culdesac) the jurisdiction of the state, for all purposes of government, was full and complete."

The situation at Bemidji is the same as it was at Culdesac. It is not within the Indian country, and consequently the statute alone would not justify any prosecution for the introduction of liquor into that country. The power of the government must rest, as it rested in the case of Dick v. U. S., upon a treaty; and the treaty invoked is the treaty with the Chippewa Indians of February 22, 1855, which is in 10 Statutes at Large, p. 1165. Article 7 of that treaty is as follows:

"Art. 7. The laws which have been or may be enacted by Congress, regulating trade and intercourse with the Indian tribes, to continue and be in force within and upon the several reservations provided for herein; and those portions of said laws which prohibit the introduction, manufacture, use of, and traffic in, ardent spirits, wines, or other liquors, in the Indian country, shall continue and be in force, within the entire boundaries of the country herein ceded to the United States, until otherwise provided by Congress."

The first and most important case to be considered is U. S. v. 43 Gallons of Whisky, 93 U. S. 188, 23 L. Ed. 846. That case involved a treaty made with the Chippewa Indians in 1863, by which they ceded certain lands in Minnesota to the United States. It contained a clause similar to article 7 of the treaty of 1855. The court said there at page 194 of 93 U. S. (23 L. Ed. 846):

"It was contended, among other things, that the sale of liquor to an Indian, or any other person within the county, was a matter of state regulation, with which Congress had nothing to do. But this court held that the power to regulate commerce with the Indian tribes was, in its nature, general, and not confined to any locality; that its existence necessarily implied the right to exercise it, whenever there was a subject to act upon, although within the limits of a state, and that it extended to the regulation of commerce with the individual members of such tribes."

The court further said at page 195 of 93 U. S. (23 L. Ed. 846):

"As long as these Indians remain a distinct people, with an existing tribal organization, recognized by the political department of the government, Congress has the power to say with whom, and on what terms, they shall deal, and what articles shall be contraband. If liquor is injurious to them inside of a reservation, it is equally so outside of it; and why cannot Congress forbid its introduction into a place near by, which they would be likely to frequent?"

And at page 196 of 93 U. S. (23 L. Ed. 846):

"The power to define originally the 'Indian country' within which the unlicensed introduction and sale of liquors were prohibited necessarily includes that of enlarging the prohibited boundaries, whenever in the opinion of Congress the interests of Indian intercourse and trade will be best subserved."

And finally, at page 198 of 93 U. S. (23 L. Ed. 846):

"If this result can be thus obtained, surely the federal government may, in the exercise of its acknowledged power to treat with Indians, make the provision in question, coming, as it fairly does, within the clause relating to the regulation of commerce."

This case has been referred to in subsequent decisions. In the case of Dick v. U. S., before mentioned, there was under consideration a treaty with the Indians which prohibited for the period of 25 years the introduction of intoxicating liquor into lands then ceded by them. The court in delivering the opinion repeatedly referred to that circumstance, and seemed to indicate that the period of prohibition was important. In speaking of the case of U. S. v. 43 Gallons of Whisky, the court said at page 359 of 208 U. S., page 405 of 28 Sup. Ct. (52 L. Ed. 520):

"In view of some contentions of counsel and of certain general observations in the case of Forty-Three Gallons of Whisky, above cited, not necessary to the decision of that case, but upon which some stress has been laid, it is well to add that we do not mean by anything now said to indicate what in our judgment is the full scope of the treaty-making power of Congress, nor how far, if at all, a treaty may permanently displace valid state laws or regulations."

The latest case to which my attention has been called is U. S. v. Sutton, 215 U. S. 291, 30 Sup. Ct. 116, 54 L. Ed. 200. There a prosecution for the introduction of liquor into Indian country was upheld; but it appeared that the "Indian country" there in question was a tract of land which had been allotted to an Indian, the title to which was still held in trust for him by the United States. It may be argued that the authority of the case of U. S. v. 43 Gallons of Whisky has been somewhat qualified by what was said in the case of Dick v. U. S., and by the fact that the case of U. S. v. Sutton, supra, was put upon somewhat different grounds. It was nevertheless in the first case distinctly held that Congress had the power, not only to prohibit the introduction of liquor into an Indian reservation, into what was in fact Indian country, but also to prohibit the introduction of liquor into adjoining country, not Indian country, but within the limits of an organized state. So far as this court is concerned, that statement must be considered as binding upon it. The law must be considered as settled that Congress has the power to prohibit the introduction of liquor into lands not Indian country, but adjoining it, within the limits of a state.

But, when this is admitted and conceded, the present case is not yet in my judgment resolved. The question here presented is not a question as to the power of Congress. As I have already said, it is within the power of Congress, after a state has been admitted to the Union, to prohibit the introduction of liquor into not only Indian country, but into the adjoining country. That it had that power before the state was admitted and while the land was within the limits of a territory is unquestioned. At the time when the treaty of 1855 was negotiated the government had undoubtedly the power to insert in that treaty the provisions therein contained. So it is not at all a question of power, but it is a question whether that provision in the

treaty of 1855 is still in force, or whether any subsequent act of Congress has modified or repealed it. Such questions are decided neither by U. S. v. 43 Gallons of Whisky nor by Dick v. U. S. In each of those cases the treaty under consideration was made after the state had been admitted to the Union. These questions can only be answered by reference to the proceedings which took place when the state of Minnesota was admitted to the Union, and by reference to the authorities.

The enabling act was passed on the 26th of February, 1857 (chapter 60, 11 Stat. 166). It provided in section 5, subd. 5, as follows:

"Provided, the foregoing propositions herein offered are on the condition, that the said convention which shall form the Constitution of said state shall provide, by a clause in said Constitution, or an ordinance, irrevocable without the consent of the United States, that said state shall never interfere with the primary disposal of the soil within the same, by the United States, or with any regulations Congress may find necessary for securing the title in said soil to bona fide purchasers thereof; and that no tax shall be imposed on lands belonging to the United States, and that in no case shall nonresident proprietors be taxed higher than residents."

These were the only agreements which Congress imposed as a condition for the entrance of Minnesota into the Union. There is nothing whatever said in the enabling act with reference to Indians. There is nothing said in it with reference to this treaty of 1855, or with reference to any other treaty. Nothing was inserted therein requiring the state in its Constitution to recognize the treaty of 1855, or any other treaty, or as to the rights of the Indians to any lands within the boundaries of the state. When the Constitution was adopted it contained no such recognition, and Indians are mentioned in only two places therein. By article 7, § 1, they are given the right to vote under certain circumstances. By article 15, § 2, it is provided as follows:

"Residents on Indian Lands. Persons residing on Indian lands within the state shall enjoy all the rights and privileges of citizens, as though they lived in any other portion of the state, and shall be subject to taxation."

It will be noticed that that section uses the word "persons." It does not say white persons or Indians, and just what effect should be given to it I shall not take time to consider. It is sufficient to say that it certainly in no way limits the rights of the state. The act admitting the state of Minnesota into the Union was passed May 11, 1858 (Act May 11, 1858, c. 31, 11 Stat. 285). That act provided in its first section:

"That the state of Minnesota shall be one, and is hereby declared to be one, of the United States of America, and admitted into the Union on an equal footing with the original states in all respects whatever."

Section 3 provided in part:

"That from and after the admission of the state of Minnesota, as hereinbefore provided, all the laws of the United States which are not locally inapplicable shall have the same force and effect within that state as in other states of the Union."

The act contained nothing which in any way limited the powers of the state.

As I said before, the question is: What effect, if any, did the act admitting the state into the Union have upon the treaty of 1855? Did it repeal it, or did it modify it? When I say repeal, I do not mean did it repeal all of the treaty, but did it repeal that part of article 7 which prohibited the introduction of liquor into ceded lands? I do not understand that it is claimed that the act had the effect of repealing that part of article 7 which related to the lands reserved and set apart by that treaty for the Indians. .I do not understand that it is claimed that the provisions of the treaty were not in full force with regard to what was Indian country after the treaty; and no such claim can be successfully maintained, because the United States had the same jurisdiction over the reservations set apart in that treaty as it had over reservations in any other state of the Union. Whether that jurisdiction is based upon the commerce clause in the Constitution, whether it is based upon the peculiar relations of the United States to the Indians, or whether it is based upon that provision of the Constitution which gives to the United States the power to make all needful rules and regulations respecting the territories and other property of the United States, it is not necessary to determine. That such power exists is unquestioned. U. S. v. Kagama, 118 U. S. 375, 6 Sup. Ct. 1109, 30 L. Ed. 228. The question in the case is whether the act admitting Minnesota into the Union repealed that part of article 7 of the treaty of 1855 which prohibited the introduction of ardent spirits into the ceded lands. That question must be determined by the authorities.

Upon the power of Congress with reference to existing treaties the Cherokee Tobacco Case, 11 Wall. 616, is important. The court said on page 617 (20 L. Ed. 227):

"The proceeding was instituted by the defendants in error to procure the condemnation and forfeiture of the tobacco in question, and of the other property described in the libel of information, for alleged violations, which are fully set forth, of the revenue laws of the United States."

The court said at page 618 of 11 Wall. (20 L. Ed. 227):

"The only question argued in this court, and upon which our decision must depend, is the effect to be given, respectively, to the 107th section of the act of 1868, and the 10th article of the treaty of 1866, between the United States and the Cherokee nation of Indians. They are as follows:

" 'Sec. 107. That the internal revenue laws imposing taxes on distilled spirits, fermented liquors, tobacco, snuff, and cigars, shall be construed to extend to such articles produced anywhere within the exterior boundaries of the United States, whether the same shall be within a collection district or not.'

" 'Art. 10. Every Cherokee Indian and freed person residing in the Cherokee Nation shall have the right to sell any products of his farm, including his or her live stock, or any merchandise or manufactured products, and to ship and drive the same to market without restraint, paying any tax thereon which is now or may be levied by the United States on the quantity sold outside of the Indian territory.'

"On behalf of the claimants, it is contended that the 107th section was not intended to apply, and does not apply, to the country of the Cherokees, and that the immunities secured by the treaty are in full force there. The United States insist that the section applies with the same effect to the territory in question as to any state or other territory of the United States, and that to the extent of the provisions of the section the treaty is annulled."

And further at page 620 of 11 Wall. (20 L. Ed. 227):

"But, conceding these views to be correct, it is insisted that the section cannot apply to the Cherokee Nation because it is in conflict with the treaty. Undoubtedly one or the other must yield. The repugnancy is clear, and they cannot stand together. The second section of the fourth article of the Constitution of the United States declares that 'this Constitution and the laws of the United States which shall be made in pursuance thereof, and all treaties which shall be made under the authority of the United States, shall be the supreme law of the land.' It need hardly be said that a treaty cannot change the Constitution or be held valid if it be in violation of that instrument. This results from the nature and fundamental principles of our government. The effect of treaties and acts of Congress, when in conflict, is not settled by the Constitution. But the question is not involved in any doubt as to its proper solution. A treaty may supersede a prior act of Congress, and an act of Congress may supersede a prior treaty. In the cases referred to these principles were applied to treaties with foreign nations. Treaties with Indian nations within the jurisdiction of the United States, whatever considerations of humanity and good faith may be involved and require their faithful observance, cannot be more obligatory. They have no higher sanctity; and no greater inviolability or immunity from legislative invasion can be claimed for them. The consequences in all such cases give rise to questions which must be met by the political department of the government. They are beyond the sphere of judicial cognizance. In the case under consideration the act of Congress must prevail as if the treaty were not an element to be considered. If a wrong has been done the power of redress is with Congress, not with the judiciary, and that body, upon being applied to, it is to be presumed will promptly give the proper relief."

Going back to the case of the United States v. 43 Gallons of Whisky, it was there declared to be the law, and is now the law, that Congress can prevent the introduction of intoxicating liquor onto lands adjacent to either one of these reservations. If it is held by the courts that the act admitting Minnesota into the Union repealed this provision of the treaty of 1855, it is within the power of Congress to re-enact it. If it is believed by Congress that that provision has always been in force and is still in force, it will be very easy for it to correct any judicial decision to the contrary.

In the case of U. S. v. McBratney, 104 U. S. 621, 26 L. Ed. 869, the question certified to the Supreme Court of the United States was "whether the Circuit Court of the United States sitting in and for the District of Colorado has jurisdiction of the crime of murder, committed by a white man upon a white man, within the Ute reservation in said district, and within the geographical limits of the state of Colorado." The court said at page 623 of 104 U. S. (26 L. Ed. 869):

"By the first section of the Act of Congress of February 28, 1861 (chapter 59), to provide a temporary government for the territory of Colorado, all territory which, by treaty with any Indian tribe, was not, without its consent, to be included within the territorial limits or jurisdiction of any state or territory, was excepted out of the boundaries, and constituted no part of the territory of Colorado; and by the sixteenth section 'the Constitution and all laws of the United States which are not locally inapplicable shall have the same force and effect within the said territory of Colorado as elsewhere within the United States.' 12 Stat. 172, 176. If this provision of the section had remained in force after Colorado became a state, this indictment might doubtless have been maintained in the Circuit Court of the United States. United States v. Rogers, 4 How. 567 (11 L. Ed. 1105); Bates v. Clark, 95 U. S. 204 (24 L. Ed. 471); United States v. Ward, 1 Woolw. 17, 21 (Fed. Cas.

No. 16,639). But Act Cong. March 3, 1875, c. 139, for the admission of Colorado into the Union, authorized the inhabitants of the territory 'to form for themselves out of said territory a state government, with the name of the state of Colorado; which state, when formed, shall be admitted into the Union upon an equal footing with the original states in all respects whatsoever,' and the act contains no exception of the Ute Reservation, or of jurisdiction over it. 18 Stat. pt. 3, p. 474. The provision of section 1 of the subsequent act of June 26, 1876 (chapter 147, 19 Stat. 61), that upon the admission of the state of Colorado into the Union 'the laws of the United States, not locally inapplicable, shall have the same force and effect within the state as elsewhere within the United States,' does not create any such exception. Such a provision has a less extensive effect within the limits of one of the states of the Union than in one of the territories of which the United States have sole and exclusive jurisdiction. The act of March 3, 1875, necessarily repeals the provisions of any prior statute, or of any existing treaty, which are clearly inconsistent therewith. The Cherokee Tobacco, 11 Wall. 616 (20 L. Ed. 227). Whenever upon the admission of a state into the Union Congress has intended to except out of it an Indian reservation, or the sole and exclusive jurisdiction over that reservation, it has done so by express words. The Kansas Indians, 5 Wall. 737 (18 L. Ed. 667); United States v. Ward, supra. The state of Colorado by its admission into the Union by Congress upon an equal footing with the original states in all respects whatever, without any such exception as had been made in the treaty with the Ute Indians, and in the act establishing territorial government, has acquired criminal jurisdiction over its own citizens and other white persons throughout the whole of the territory within its limits, including the Ute Reservation, and that reservation is no longer within the sole and exclusive jurisdiction of the United States."

So in the case of Minnesota the United States government when it was admitted into the Union did not see fit to make any exception or reservation with regard to lands occupied by Indians, or lands which the Indians had previously ceded.

In the case of Draper v. U. S., 164 U. S. 240, the court said at page 242, 17 Sup. Ct. 107, 41 L. Ed. 419:

"The territory of Montana was organized by Act May 26, 1864, c. 95, 13 Stat. 85. Subsequently, in 1868, the Crow Indian Reservation was created (15 Stat. 649), the land of which it was composed being wholly situated within the geographical boundaries of the territory of Montana. The treaty creating this reservation contained no stipulation restricting the power of the United States to include the land embraced within the reservation in any state or territory then existing or which might thereafter be created. The law to enable Montana and other states to be admitted into the Union was passed February 22, 1889 (25 Stat. 676, c. 180). This act embraced the usual provisions for a convention to frame a Constitution, for the adoption of an ordinance directed to contain certain specified agreements, and provided that upon the compliance with the ordained requirements, and the proclamation of the president so announcing, the state should be admitted on an equal footing with the original states. The question then is: Has the state of Montana jurisdiction over offenses committed within its geographical boundaries by persons not Indians or against Indians, or did the enabling act deprive the courts of the state of such jurisdiction of all offenses committed on the Crow Indian Reservation, thereby divesting the state pro tanto of equal authority and jurisdiction over its citizens, usually enjoyed by the other states of the Union?"

After a statement of the case of U. S. v. McBratney, the court said on page 243 of 164 U. S., page 108 of 17 Sup. Ct. (41 L. Ed. 419):

"United States v. McBratney is therefore decisive of the question now before us, unless the enabling act of the state of Montana contained provisions

taking that state out of the general rule, and depriving its courts of the jurisdiction to them belonging and resulting from the very nature of the equality conferred on the state by virtue of its admission into the Union. Such exception is sought here to be evolved from certain provisions of the enabling act of Montana which were ratified by an ordinance of the convention which framed the Constitution of that state."

The section relied upon provided, in substance, that the Indian lands within the state should remain under the absolute jurisdiction and control of the United States. Notwithstanding that provision, the court held that the courts of the state had jurisdiction over the offense which was being prosecuted.

In the case of Ward v. Race Horse, 163 U. S. 504, 16 Sup. Ct. 1076, 41 L. Ed. 244, article 4 of the treaty made on the 24th of February, 1869, with the Bannock Tribe of Indians, provided as follows:

"The Indians herein named agree, when the agency house and other buildings shall be constructed on their reservations named, they will make said reservations their permanent home, and they will make no permanent settlement elsewhere; but they shall have the right to hunt upon the unoccupied lands of the United States so long as game may be found thereon, and so long as peace subsists among the whites and Indians on the borders of the hunting districts."

The case says at page 505 of 163 U. S., page 1076 of 16 Sup. Ct. (41 L. Ed. 244):

"In July, 1868, an act had been passed erecting a temporary government for the territory of Wyoming (15 Stat. 178, c. 235), and in this act it was provided as follows: 'That nothing in this act shall be construed to impair the rights of person or property now pertaining to the Indians in said territory, so long as such rights shall remain unextinguished by treaty, between the United States and such Indians.' Wyoming was admitted into the Union on July 10, 1890. 26 Stat. 222, c. 664. Section 1 of that act provides as follows: 'That the state of Wyoming is hereby declared to be a state of the United States of America, and is hereby declared admitted into the Union on an equal footing with the original states in all respects whatever; and that the Constitution which the people of Wyoming have formed for themselves be, and the same is hereby accepted, ratified and confirmed.' The act contains no exception or reservation in favor of or for the benefit of Indians. The Legislature of Wyoming on July 20, 1895 (Laws Wyo. 1895, c. 98, p. 225), passed an act regulating the killing of game within the state. In October, 1895, the district attorney of Uinta county, state of Wyoming, filed an information against the appellee (Race Horse) for having killed in that county seven elk, in violation of the law of the state. He was taken into custody by the sheriff, and it was to obtain a release from imprisonment authorized by a commitment issued under these proceedings that the writ of habeas corpus was sued out. The following facts are unquestioned: (1) That the elk were killed in Uinta county, Wyo., at a point about 100 miles from the Ft. Hall Indian Reservation, which is situated in the state of Idaho; (2) that the killing was in violation of the laws of the state of Wyoming; (3) that the place where the killing took place was unoccupied public land of the United States, in the sense that the United States was the owner of the fee of the land; (4) that the place where the elk were killed was in a mountainous region some distance removed from settlements, but was used by the settlers as a range for cattle, and was within election and school districts of the state of Wyoming."

The opinion of the court was delivered by Chief Justice, then Justice, White, who said at page 510 of 163 U. S., page 1078 of 16 Sup. Ct. (41 L. Ed. 244):

"The argument now advanced in favor of the continued existence of the right to hunt over the land mentioned in the treaty, after it had become subject to state authority, admits that the privilege would cease by the mere fact that the United States disposed of its title to any of the land, although such disposition, when made to an individual, would give him no authority over game, and yet that the privilege continued when the United States had called into being a sovereign state, a necessary incident of whose authority was the complete power to regulate the killing of game within its borders. This argument indicates at once the conflict between the right to hunt in the unoccupied lands, within the hunting district, and the assertion of the power to continue the exercise of the privilege in question in the state of Wyoming in defiance of its laws. That 'a treaty may supersede a prior act of Congress, and an act of Congress supersede a prior treaty,' is elementary. Fong Yue Ting v. United States, 149 U. S. 698 [13 Sup. Ct. 1016, 37 L. Ed. 905]; The Cherokee Tobacco, 11 Wall. 616 [20 L. Ed. 227]. In the last case it was held that a law of Congress imposing a tax on tobacco, if in conflict with a prior treaty with the Cherokees, was paramount to the treaty. Of course, the settled rule undoubtedly is that repeals by implication are not favored, and will not be held to exist if there be any other reasonable construction. Cope v. Cope, 137 U. S. 682 [11 Sup. Ct. 222, 34 L. Ed. 832], and authorities there cited. But, in ascertaining whether both statutes can be maintained, it is not to be considered that any possible theory by which both can be enforced must be adopted, but only that repeal by implication must be held not to have taken place if there be a reasonable construction by which both laws can coexist consistently with the intention of Congress. United States v. Sixty-Seven Packages Dry Goods, 17 How. 85 [15 L. Ed. 54]; District of Columbia v. Hutton, 143 U. S. 18 [12 Sup. Ct. 369, 36 L. Ed. 60]; Frost v. Wenie, 157 U. S. 46 [15 Sup. Ct. 532, 39 L. Ed. 614]. The act which admitted Wyoming into the Union, as we have said, expressly declared that that state should have all the powers of the other states of the Union, and made no reservation whatever in favor of the Indians. These provisions alone considered would be in conflict with the treaty if it was so construed as to allow the Indians to seek out every unoccupied piece of government land and thereon disregard and violate the state law, passed in the undoubted exercise of its municipal authority. But the language of the act admitting Wyoming into the Union, which recognized her coequal rights, was merely declaratory of the general rule. In Pollard v. Hagan, 3 How. 212 [11 L. Ed. 565 (1845)], the controversy was as to the validity of a patent from the United States to lands situate in Alabama, which at the date of the formation of that state were part of the shore of the Mobile river between high and low water mark. It was held that the shores of navigable waters and the soil under them were not granted by the Constitution to the United States, and hence the jurisdiction exercised thereover by the federal government, before the formation of the new state, was held temporarily in trust for the new state, to be thereafter created, and that such state when created, by virtue of its being, possessed the same rights and jurisdiction as had the original states. And, replying to an argument based upon the assumption that the United States had acquired the whole of Alabama from Spain, the court observed that the United States would then have held it subject to the Constitution and laws of its own government. The court declared (page 229) that to refuse to concede to Alabama sovereignty and jurisdiction over all the territory within her limits would be to 'deny that Alabama has been admitted into the Union on an equal footing with the original states.' The same principles were applied in Permoli v. First Municipality, 3 How. 589 [11 L. Ed. 739]. In Withers v. Buckley, 20 How. 84 [15 L. Ed. 816 (1857)], it was held that a statute of Mississippi creating commissioners for a river within the state, and prescribing their powers and duties, was within the legitimate and essential powers of the state. In answer to the contention that the statute conflicted with the act of Congress which authorized the people of Mississippi Territory to form a Constitution, in that it was inconsistent with the provision in the act that 'the navigable rivers and waters leading into the same shall be common highways, and forever free, as well to the inhabitants of the state of Mississippi as to other citizens of the United States,' the court

said (page 92 of 20 How. [15 L. Ed. 816]): 'In considering this act of Congress of March 1, 1817, it is unnecessary to institute any examination or criticism as to its legitimate meaning, or operation,' or binding authority, farther than to affirm that it could have no effect to restrict the new state in any of its necessary attributes as an independent sovereign government, not to inhibit or diminish its perfect equality with the other members of the confederacy with which it was to be assaciated. These conclusions follow from the very nature and objects of the confederacy, from the language of the constitution adopted by the states, and from the rule of interpretation pronounced by this court in the case of Pollard's Lessee v. Hagan, 3 How. 223 [11 L. Ed. 565].' A like ruling was made in Escanaba Company v. Chicago, 107 U. S. 678 [2 Sup. Ct. 185, 27 L. Ed. 442 (1882)], where provisions of the ordinance of 1787 were claimed to operate to deprive the state of Illinois of the power to authorize the construction of bridges over navigable rivers within the state. The court, through Mr. Justice Field, said (page 683 of 107 U. S., page 189 of 2 Sup. Ct. [27 L. Ed. 442]): 'But the states have full power to regulate within their limits matters of internal police, including in that general designation whatever will promote the peace, comfort, convenience, and prosperity of their people.' And it was further added (page 688 of 107 U. S., page 193 of 2 Sup. Ct. [27 L. Ed. 442]): 'Whatever the limitation upon her powers as a government whilst in a territorial condition, whether from the ordinance of 1787 or the legislation of Congress, it ceased to have any operative force, except as voluntarily adopted by her, after she became a state of the Union. On her admission she at once became entitled to and possessed of all the rights of dominion and sovereignty which belonged to the original states. She was admitted, and could be admitted, only on the same footing with them. * * * Equality of the constitutional right and power is the condition of all the states of the Union, old and new.' In Cardwell v. American Bridge Company, 113 U. S. 205 [5 Sup. Ct. 423, 28 L. Ed. 959 (1884)], Escanaba Company v. Chicago, supra, was followed, and it was held that a clause in the act admitting California into the Union, which provided that the navigable waters within the state shall be free to citizens of the United States, in no way impaired the power which the state could exercise over the subject if the clause in question had no existence. Mr. Justice Field concluded the opinion of the court as follows (page 212 of 113 U. S., page 426 of 5 Sup. Ct. [28 L. Ed. 959]) ; 'The act admitting California declares that she is "admitted into the Union on an equal footing, with the original states in all respects whatever." She was not, therefore, shorn by the clause as to navigable waters within her limits of any of the powers which the original states possessed over such waters within their limits.' A like conclusion was applied in the case of Willamette Iron Bridge Co. v. Hatch, 125 U. S. 1 [8 Sup. Ct. 811, 31 L. Ed. 629], where the act admitting the state of Oregon into the Union was construed. Determining by the light of these principles the question whether the provision of the treaty giving the right to hunt on unoccupied lands of the United States in the hunting districts is repealed in so far as the lands in such districts are now embraced within the limits of the state of Wyoming, it becomes plain that the repeal results from the conflict between the treaty and the act admitting that state into the Union. The two facts, the privilege conferred, and the act of admission are irreconcilable in the sense that the two under no reasonable hypothesis can be construed as coexisting. The power of all the states to regulate the killing of game within their borders will not be gainsaid, yet, if the treaty applied to the unoccupied land of the United States in the state of Wyoming, that state would be bereft of such power, since every isolated piece of land belonging to the United States as a private owner, so long as it continued to be unoccupied land, would be exempt in this regard from the authority of the state. Wyoming, then, will have been admitted into the Union, not as an equal member, but as one shorn of a legislative power vested in all the other states of the Union, a power resulting from the fact of statehood and incident to its plenary existence. Nor need we stop to consider the argument advanced at bar, that as the United States, under the authority delegated to it by the Constitution in relation to Indian tribes, has a right to deal with

that subject, therefore it has the power to exempt from the operation of state game laws each particular piece of land owned by it in private ownership within a state, for nothing in this case shows that this power has been exerted by Congress. The enabling act declares that the state of Wyoming is admitted on equal terms with the other states, and this declaration, which is simply an expression of the general rule, which presupposes that states, when admitted into the Union, are endowed with powers and attributes equal in scope to those enjoyed by the states already admitted, repels any presumption that in this particular case Congress intended to admit the state of Wyoming with diminished governmental authority. The silence of the act admitting Wyoming into the Union as to the reservation of rights in favor of the Indians is given increased significance by the fact that Congress in creating the territory expressly reserved such rights. Nor would this be affected by conceding that Congress during the existence of the territory had full authority in the exercise of its treaty making power to charge the territory, or the land therein, with such contractual burdens as were deemed best, and that, when they were imposed on a territory, it would be also within the power of Congress to continue them in the state on its admission into the Union. Here the enabling act not only contains no expression of the intention of Congress to continue the burdens in question in the state, but, on the contrary, its intention not to do so is conveyed by the express terms of the act of admission."

The fact that Mr. Justice Brown dissented in that case shows that the opinion of the court was announced only after full and careful deliberation.

In the case against Sutton, to which I have referred, the opinion was apparently based upon the act admitting Washington into the Union. In that the court said:

"If the Yakima Reservation were within the limits of a territory, there would be no question of the validity of the statute under which this indictment was found, but the contention is that the offense charged is of a police nature, and that the full police power is lodged in the state, and by it alone can such offenses be punished. By the second paragraph of section 4 of the enabling act with respect to the state of Washington (chapter 180, 25 Stat. 677), the people of that state disclaimed all right and title 'to all lands lying within said limits owned or held by any Indian or Indian tribes; and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States.' Construing this in connection with other provisions of the enabling act, it was held in Draper v. United States, 164 U. S. 240 [17 Sup. Ct. 107, 41 L. Ed. 419], that it did not deprive the state of jurisdiction over crimes committed within a reservation by others than Indians or against Indians, following in this United States v. McBratney, 104 U. S. 621 [26 L. Ed. 869]. But in terms 'jurisdiction and control' over Indian lands remain in the United States, and, there being nothing in the section withdrawing any other jurisdiction than that named in Draper v. United States, undoubtedly Congress has the right to forbid the introduction of liquor, and to provide punishment for any violation thereof."

Congress has understood that in order to prohibit the manufacture and sale of intoxicating liquors in ceded Indian lands, not reservations, after the Territory is admitted as a state, it is necessary that some provision relating thereto be inserted in the enabling act. This is shown by its treatment of Oklahoma. The enabling act for that territory (Act June 16, 1906, c. 3335, 34 Stat. 267 [U. S. Comp. St. Supp. 1909, p. 154]) expressly provided on page 869:

"And said convention shall provide in said Constitution: * * * Second. That the manufacture, sale, barter, giving away or otherwise furnishing,

except as hereinafter provided, of intoxicating liquors within those parts of said state now known as the Indian Territory and the Osage Indian Reservation and within any other parts of said state which existed as Indian reservations on the 1st day of January, nineteen hundred and six, is prohibited for a period of twenty-one years from the date of the admission of said state into the Union, and thereafter until the people of said state shall otherwise provide by amendment of said Constitution and proper state legislation."

Other provisions were required to be inserted relating to the establishment of public agencies where alcohol for the industrial arts might be sold, and where intoxicating liquors might be sold to druggists. This act came before the Circuit Court of the United States for the Western District of Arkansas in the case of United States ex rel. Friedman v. United States Express Company (D. C.) 180 Fed. 1006, decided last July. This was a mandamus brought by Friedman against the express company to compel it to receive and ship intoxicating liquors to its customers in that part of Oklahoma formerly the Indian Territory. The court held that the act admitting Oklahoma into the Union had repealed the act of 1897, relating to the introduction of liquors into the Indian country, so far as the Indian Territory was concerned, and granted the mandamus.

In view of these decisions, and particularly Ward v. Race Horse, what becomes of this provision of the treaty of 1855? I can see no difference whatsoever in principle between this case and that case. There is, to be sure, this difference: That in the Race Horse Case the act prohibiting was a state act, and the act permitting was a federal act; while here the act prohibiting is a federal act, and the act permitting is a state act. When I say "permitting," I mean that under the laws of Minnesota intoxicating liquors can be sold under certain circumstances in this district. Notwithstanding this difference in form, I see no difference in principle between the two cases. The question is: Where is the power to regulate? Does the United States government have the power to regulate the sale of intoxicating liquors in this district, or does the state of Minnesota have that power? It was said in the Matter of Heff, 197 U. S. 488, 25 Sup. Ct. 506, 49 L. Ed. 818, that there could be no divided authority. If the United States government has the power to regulate it, that power must come in conflict with the power of the state to regulate it. Moreover, a condition of things might arise where the two cases would be identical. The act of 1897 provides, as other acts have provided, that intoxicating liquors might be introduced into the Indian country by the consent of the War Department. The laws of Minnesota provide that a town may vote that no license shall be granted and no liquor shall be sold therein. If the War Department should undertake to give permission to some person to establish a dispensary within the limits of a town which had voted not to have any license, there would be immediately a conflict between the two jurisdictions and the identical case would be presented which was presented in the Race Horse Case. That case is conclusive upon this question to my mind, and holds that this provision of the treaty of 1855 so far as it relates to ceded territory has been repealed. It is said that the case of the United States v. 43 Gallons of Whisky is a holding to the contrary, and that the

case of Dick v. United States is another holding to the contrary; but in both of these cases the treaties were made after the state had been admitted to the Union, and no question of this kind was either discussed or decided. It may be said that the repeal was unintentional. It may be said that there was not any actual intention on the part of Congress to discontinue this clause with reference to ceded territory. In support of this claim, it may be argued that a similar clause was afterwards inserted in the treaty of 1863. But that was not the act of Congress. It was the act only of the President and the Senate. Moreover, the extent of territory covered by that treaty was very much smaller than that covered by the treaty in question. Before one says that this repeal was unintentional, it would be well for him to consider some of the facts alleged in the bill and admitted by the demurrer.

The tract of land ceded by this treaty commences about 30 miles west from the eastern boundary of the state, and extends westward more than 180 miles to the Dakota line. It commences near the city of Brainerd, which is about the geographical center of the state, and extends northerly more than 150 miles to the Canadian line. It covers an area of more than 15,000 square miles, and geographically is larger than the three New England states of Massachusetts, Rhode Island, and Connecticut. It has a population of 382,191, or more than the entire population of the state of Montana. The property in the district was assessed for taxation last year at $93,910,142. There is within this district Bemidji, the county seat of Beltrami county, Brainerd, the county seat of Crow Wing county, Walker, the county seat of Cass county, Bagley, the county seat of Clearwater county, Grand Rapids, the county seat of Itasca county, Park Rapids, the county seat of Hubbard county, and Detroit, the county seat of Becker county. This is not all. Before the question as to whether the repeal was intentional or not is decided, there must be considered the Sioux treaty of July 23, 1851 (10 Stat. 949). This contained a similar provision, and the land covered by it commences at the southeast boundary of the state, and includes all the land in the state on the west side of the Mississippi river from there to Moorhead. There is more still. The Chippewa treaty of September 30, 1854 (10 Stat. 1109), contained a clause prohibiting the sale of intoxicating liquors in the lands thereby ceded. The tract covered by that treaty includes the present city of Duluth, with a population of 75,000 and a large tract of country, in that part of the state. It is safe to say that at the time Minnesota was admitted into the Union three-fourths of its entire area was in the same condition, so far as the sale of intoxicating liquors is concerned, as the lands in question in this case. While the present condition of the country perhaps was not then foreseen, Congress must have had in mind that the state would increase rapidly in wealth and population. Was it the intent of Congress to keep in force a prohibition through such a vast extent of territory as this? Was it the intent of Congress to keep in force such a prohibition, and pay the enormous expense that would be necessary to make it effective? There is a significant provision in this Sioux treaty of 1851. That treaty

ceded to the United States all the lands owned by the Sioux Indians in the state of Iowa, and all the lands in the then territory of Minnesota east of a line therein described, which is now practically the western boundary of the state. It declared that the provisions of the general law relating to the introduction of intoxicating liquors into the Indian country should continue to be in force in all of the lands ceded which lay within the territory of Minnesota. It said nothing at all about the lands ceded which lay in the state of Iowa. That omission, to my mind, is extremely significant. It can mean but one thing, and that is that it was in the mind of Congress that it had no power to prohibit the introduction of intoxicating liquors into the state of Iowa. If that were not the reason, why was there not the same provision with regard to Iowa that there was with regard to Minnesota? In view of these facts, who can say with any degree of certainty that this repeal was not intentional? It would have been the most simple thing in the world for Congress to have inserted some provision in the enabling act preserving this treaty stipulation with reference to the rights of the Indians, and requiring its insertion in the Minnesota Constitution, as they required Oklahoma to insert a similar provision in its Constitution. But nothing of that kind was done.

There is another matter that has been referred to, and that is the practical construction that has been put upon this treaty by the government. The bill alleges that the United States never attempted to enforce the treaty in the ceded lands until last year. The treaty having been promulgated in 1855, there passed more than 50 years of absolute quiescence on the part of the government. It can therefore well be said that it never was supposed that this treaty stipulation survived the admission of Minnesota into the Union. But it is entirely beside the mark to guess and speculate as to what Congress would have done if its attention had been particularly called to the precise question here under discussion. This case must be decided, not upon an intention which was not expressed, but upon one that was expressed. Referring again to the case of Ward v. Race Horse, the court there said:

"The act which admitted Wyoming into the Union, as we have said, expressly declared that that state should have all the powers of the other states of the Union, and made no reservation whatever in favor of the Indians. These provisions alone considered would be in conflict with the treaty if it were so construed as to allow the Indians to seek out every unoccupied piece of government land and thereon disregard and violate the state law, passed in the undoubted exercise of its municipal authority."

The opinion of the Attorney General (25 Op. Atty. Gen. 416) to my mind does not cover this case, because it refers to reservations, and not to ceded lands. While it is true that there are certain statements in the opinion to the effect that the provision as to ceded lands is still in force, yet no authorities are cited in support of that statement.

I can come to only one conclusion in the case, and that is that the provision in article 7 of the treaty of 1855, which prohibited the introduction of intoxicating liquors into the ceded country, was repealed by the act admitting Minnesota into the Union. It is therefore not necessary to consider any of the other questions argued by counsel. I express no opinion upon the question as to whether the subsequent

treaty of 1865 re-ceding to the Indians the land where Bemidji now stands, and the treaty of 1867 by which the Indians again ceded to the United States that land, with no clause of this kind in the treaty, repealed article 7 of the treaty of 1855. One of the grounds of demurrer to the bill states that the court has no jurisdiction of the case. Its jurisdiction rests upon diverse citizenship. It may be said to rest, also, upon the fact that the case arises under the laws of the United States. Yet, if it did, that would not defeat the jurisdiction, even under the ruling in Macon Grocery Co. v. Atlantic Coast Line, 215 U. S. 501, 30 Sup. Ct. 184, 54 L. Ed. 300. The objection that the defendants were sued in the wrong district was waived by their general appearance.

The result is that I will make an order overruling the demurrer to the bill, and assigning the defendants to answer at the next rule day. I will also make an order granting a temporary injunction, as prayed for in the bill.