Nott, Ch. J.,
delivered the opinion of the court:
This case presents but a single narrow question, which is whether a treaty changes and limits the liabilities of the Indian defendants in cases in this court.
On the 29th of April, 1868, the defendants, the Brulé Sioux Indians, may be said to have been liable under the various statutes of the United States, for depredations committed by one of the tribe upon the property of a citizen of the United States who had given no provocation and who had sought no revenge. On that day the tribe entered into the treaty of that date, ratified February 16,1869, and proclaimed February 24, 1869. (15 Stat. L., 635.)
The first article of that treaty provides that in case of a wrong or depredation committed by bad men among the Indians, “they will, upon proof made to their agent and notice by him, deliver up the wrongdoer to the United States, to be tried and punished according to its laws; and in case they willfully refuse so to do, the person injured shall be reimbursed *413 for bis loss from tbe annuities or other moneys due or to become due to them under this or other treaties made with the United States.” It is conceded that as regards the depredation in this case, no proof was made and no notice was given, and consequently that the defendant Indians never had an opportunity to “deliver up the wrongdoer to the United States,” and the resulting question therefore is, have they incurred a liability?
The treaty was made while the United States still regarded the Indian tribes as treaty-making powers. It was duly ratified' by the Senate and proclaimed by the President, and it is consequently to be regarded as one of the laws of the land. Being such, the question is what effect, if any, is to be given to this provision % Does it take the parties to the treaty out of the operation of the statute law, or does it leave the liability of this Indian tribe just as it was before?
It is urged on behalf of the claimant that the statutes are to be administered as if this treaty had never been made; and it is argued that if that be not so, there would be two laws for claimants in this court and that the laws of the United States would not be uniform as to their citizens. It is also urged that the treaty merely gives to the United States an option that the Government may at its pleasure demand the wrongdoers or proceed under the act of 1834.
But it must be remembered, in the first place, that a citizen of the United States possesses no natural or contractual right to make an Indian tribe pay for a wrong committed by a member of its body politic, and in the second place that the United States have never guaranteed or intended to protect and guarantee their citizens against wrongs committed by Indians, any more than they have guaranteed other citizens in other places against wrongs committed by other criminals, and in the third place that the only undertaking which has been given on the part of the Governments that it will pay the judgments which may be recovered against the Indian defendants.
Therefore it can not be held that giving effect to this treaty will introduce into these cases the element of different laws for different citizens. One Indian tribe may have incurred one liability and another Indian tribe may have incurred another liability, and all that the Government can be required to do is to enforce each liability just as it stands and whatever it may be.
*414 Does the treaty then assure to the treaty-making Indians nothing? Does it merely give to the United States an option which they did not possess before?
The treaty is comprehensive both in its terms and purpose, providing on the one hand for wrongs committed by white persons against Indians, and on the other hand, by Indians against white men, and it contains no reference in terms to the prior statutes of the United States. According to its terms, an Indian tribe is entitled to both proof and notice, which become the basis of further proceedings, and it is only in cases where the tribe willfully refuse to give up the guilty person that the treaty assures to the person injured reimbursement for his losses. The words,11 and in case they willfully refuse so to do,” imply a right to exercise their will; that is to say, to exercise an option. If they are liable under the statute as well as under the treaty, it is certain that this option will exist only when the Government chooses to give it to them — when it demands the surrender of the guilty parties.
It is manifest that the provisions of both the statute and of the treaty can not exist in their entirety; for, if the Indians should give up the wrongdoer to be tried and punished according to the treaty, no one could contend that they would still remain liable under the statute. The two provisions are certainly distinct to that extent; and the treaty certainly to that extent takes the liability of the Sioux Indians out of the operation of the statute; and if any effect can be given to the statutory provision it must be upon the theory suggested by counsel, that the treaty gives to the United States.an option— the option of demanding the wrongdoer instead of proceeding against the tribe.
If that was the intent of the treaty, it certainly should have said so. It should have signified to the Indians that their former liability would remain in force except in cases where the United States should elect to resort to this new demand. Instead of speaking comprehensively of all wrongs or depredations upon the person or property of anyone, white, black, or Indian, it should have spoken only of such as were committed by Indians whom the United States might wish to have given up to be tried and punished according to their laws; and instead of saying that if the Indians willfully refuse to so do the person injured shall be reimbursed for his loss, it should *415 have said that if they failed to so do they should remain subject to the penalties of the statute. For if it should appear that the Indians instead of willfully refusing to surrender the criminal had done their utmost to apprehend him and deliver him to the United States, it could not be contended that they would remain liable. In a word, the treaty, both in its comprehensive provisions and in the particular terms used, seems intended as an expression of the entire law or agreement which shall prevail and regulate the acts and liabilities of the contracting parties. It seems to assure to the Indians the right of exercising their will, of ridding themselves of their criminal members by surrendering them to the higher Government for punishment, or of assuming the acts of the offenders and bearing the burden of the depredations as a tribe.
It is manifest also that the restricted construction of the treaty suggested by counsel Vould equally make two laws for claimants in this court and equally in kind if not in degree prevent the laws of the United States from being uniform as to all of their citizens. In one case a claimant would still be entitled to recover against a tribe under the statute, and in another a claimant would be debarred from recovery because the Government had demanded the wrongdoer and the Indians had surrendered him. In civilized communities the law simply seeks to punish crime, and the consequences of crime have to be borne by the citizen. To the court it seems evident that the purpose of this treaty was to bring these Indians a step nearer to civilization; to encourage them in treating crime as crime; to weed out the worst Indians of a tribe; to place before all of its members the terrors of the white man’s punishment — imprisonment or the gallows — and to break up the Indian practice of sheltering criminals and paying for their depredations.
The judgment of the court is that the petition be dismissed.