Venita **TSOSIE**

v.

The **UNITED STATES.**

No. 518–84L.

United States Claims Court.

Oct. 2, 1986.

---

Joan M. O'Connell, Stephen T. LeCuyer, of counsel, Shiprock, N.M., for plaintiff.

Patricia Weiss, Washington, D.C., with whom was Asst. Atty. Gen. F. Henry Habicht, II, for defendant.

## OPINION

YOCK, Judge.

In this case, the plaintiff, an Indian woman who is a member of the Navajo tribe, brings a claim under the Treaty of 1868 with the Navajos, 15 Stat. 667, and seeks damages for an alleged sexual assault upon her by an employee of the United States Public Health Service Hospital on the Navajo reservation at Shiprock, New Mexico.

Plaintiff initially filed her claim with the United States Department of the Interior and after denial of that claim, she brought her claim to this Court. The case is presently before the Court on defendant's motion to dismiss for failure to state a claim or, in the alternative, for summary judgment.

After careful consideration of the submissions and oral arguments of the parties, and for the reasons discussed in this opinion, the defendant's motion to dismiss or, in the alternative, for summary judgment is denied. Further, the Department of the Interior's administrative decision denying the plaintiff's claim is reversed and remanded for a hearing and decision on the merits.

### Facts

The plaintiff, Ms. Venita Tsosie, is an enrolled member of the Navajo Tribe of Indians.

On or about October 14, 1978, Ms. Tsosie was admitted as an inpatient at the United States Public Health Service Hospital, Shiprock, New Mexico, which is located within the boundaries of the Navajo Indian Reservation. Her complaint alleges that on October 16, 1978, while still an inpatient at the hospital, a Public Service employee by the name of Mr. Robert Freeman, came into her room and proceeded to conduct a medical examination of her body. This examination is alleged to have caused her

physical injuries, lasting for several months, as well as considerable embarrassment and humiliation. Mr. Freeman was apparently employed at the hospital as a laboratory technician. Within two days following the alleged incident, Ms. Tsosie indicated that she complained to Dr. Laverne Husen at the hospital and gave him a written description of the alleged assault upon her.

On May 8, 1980, the plaintiff filed an administrative claim under the Federal Tort Claims Act (28 U.S.C. § 2671 *et seq.* (1976)) with the United States Department of Health and Human Services alleging that while hospitalized at the Shiprock Hospital, she had been the victim of "improper sexual contact" by Mr. Freeman. The claimant further alleged that there had been negligent hiring and lack of supervision exerted over Mr. Freeman and that the hospital knew or should have known of prior similar incidents, but failed to take steps to prevent the incident. On December 3, 1980, the Department denied the plaintiff's claim indicating that the United States cannot be held liable for damages under the Federal Tort Claims Act for assault and battery, nor did the facts indicate that there was any liability for negligent hiring or supervision. Ms. Tsosie was then advised that she could request reconsideration of the decision based on newly discovered evidence, or file suit in the appropriate United States District Court within six months. The record does not indicate that Ms. Tsosie took either of these further courses of action on her claim under the Federal Tort Claims Act (FTCA).

In addition to Ms. Tsosie filing an administrative claim for physical and mental damages under the FTCA, the plaintiff also sought criminal prosecution of Mr. Freeman by contacting the U.S. Attorney's office in New Mexico. Although the record is not clear when the plaintiff sought this action, it does support the finding that she did seek to have the alleged offending party prosecuted. In addition, the record is clear that the U.S. Attorney's office in New Mexico declined to prosecute the matter.

On July 22, 1982, the plaintiff filed its administrative claim under Article I of the Treaty of 1868 with the Assistant Secretary of Interior for Indian Affairs of the United States Department of the Interior. This claim is essentially the same claim earlier brought under the FTCA, and seeks damages for an alleged sexual assault upon her by Mr. Robert Freeman, an employee of the United States Public Health Service at the Shiprock Hospital. She claims that Mr. Freeman was a "bad man among the whites" within the contemplation of Article I of the 1868 Treaty with the Navajos, and seeks damages (reimbursements) for the "wrong" committed against her.

Article I of the 1868 Treaty provides in part:

> If bad men among the whites, or among other people subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States will, upon proof' made to the agent and forwarded to the Commissioner of Indian Affairs at Washington city, proceed at once to cause the offender to be arrested and' punished according to the laws of the United States, and also to reimburse the injured persons for the loss sustained.

On January 30, 1984, the Assistant Secretary of Interior for Indian Affairs of the United States Department of the Interior, issued his final decision denying the plaintiff's administrative claim. In that decision, the Assistant Secretary found that the bad men reimbursement provision of the 1868 Treaty detailed above was obsolete and inoperative and, thus, it had no jurisdiction or authority to decide the merits of her administrative claim.

Plaintiff next filed her complaint in this Court on October 10, 1984, seeking judicial review of the Department of the Interior's January 30, 1984 final decision, which she viewed as being arbitrary and capricious, unsupported by substantial evidence and not in accordance with the law.

As earlier indicated, the defendant has now moved to dismiss for failure to state a claim in this Court or, in the alternative, for summary judgment.

## Discussion

In support of its motion to dismiss, or in the alternative, for summary judgment, the defendant proposes five separate and distinct reasons why the plaintiff's "bad men" claim (and the Department of the Interior's decision denying that claim) should not be reviewed by this Court. In all of these positions, the defendant contends that a jurisdictional impediment exists which precludes this Court from reviewing the plaintiff's claim on the merits. The defendant's five positions can be summarized as follows. First, the defendant contends that the bad men reimbursement provision in the treaty is not self-executing in nature and must, therefore, be "implemented" by further congressional action before any reimbursement can be paid by the Government pursuant to the provision. Second, the defendant contends that the reimbursement provision is obsolete since the parties to the treaty intended the provision to expire after it had served its purpose, and, in any event, failed to use and abandoned the provision after a reasonable time had transpired. Third, the defendant asserts that Article IV of the treaty is applicable and the specific language of that article precludes any judicial review of the Department of the Interior's final decision. Fourth, the defendant asserts that the plaintiff's claim is based on tort and thus the two-year statute of limitations for tort claims against the United States is the applicable statute of limitations to apply in this case. Fifth and finally, the defendant contends that even if the tort statute of limitations is not to be applied, the plaintiff should be precluded from judicial review in this Court by the equitable doctrine of laches.

Although the defendant has presented innovative and able arguments in support of its various positions, the Court views only its position regarding obsolescence as viable, and thus will devote the majority of this opinion to that subject. Therefore, Section A of this opinion will discuss and analyze the obsolescence issue and Section B will dispose of the defendant's four other positions. Section C will then summarize and discuss the appropriate posture of the case in view of the decisions reached in Sections A and B.

### A. Obsolete Treaty Provision

As earlier indicated, the defendant's position with regard to the critical issue of obsolescence is that the bad men reimbursement provisions of Article I of the Treaty of 1868 with the Navajos became obsolete over time since the parties to the treaty intended the provisions to expire after they no longer served the purpose for which they were written into the treaty. In addition, defendant argues that the provisions over time were abandoned through nonuse. The Government points to the fact that the "bad men" reimbursement provisions were a part of Article I and that the article was written to assure peace and to eliminate the irritants that could cause warfare between the parties. In addition, the Government contends that a further purpose of the provisions was to provide the tribes, which had been removed to reservations and thus were, at that time, outside the reach of many criminal and civil laws, with a form of federal protection from depredations by whites and other Indians, and with a means suited to the sovereign relationship of the parties for providing reparation for losses caused by those depredations. Since the above mentioned concerns are no longer needed or necessary, the Government contends that the reimbursement provisions have thus expired and are obsolete.

The plaintiff's position regarding this issue is that the bad men reimbursement provisions are not obsolete because the parties never intended them to expire after a reasonable time, Congress has not specifically abrogated the provisions by subsequent legislation, and that legal precedent in the United States Court of Claims clearly holds that the provisions are still viable.

In support of her position, the plaintiff points out that Article I was not limited in time by its own terms, nor was there any intentions exhibited by the parties at the time of the signing of the treaty that the reimbursement provisions were limited in time. In addition, the plaintiff reviews several statutes, that she believes the Government relies on, to show that those statutes do not specifically abrogate the Article I reimbursement provisions of the treaty. Finally, the plaintiff relies heavily on two cases decided in the Court of Claims in the 1970's that granted individual Indian claimants the jurisdictional right to present bad men reimbursement claims to the Court, and distinguishes an 1897 case in the United States Court of Claims that held that the bad men reimbursement provisions were obsolete and abandoned and thus outside of the jurisdiction of the Court. *See Begay v. United States*, 224 Ct.Cl. 712, 650 F.2d 288 (1980), *cert. denied*, 450 U.S. 1040, 101 S.Ct. 1758, 68 L.Ed.2d 238 (1981) (*Begay* II); *Begay v. United States*, 219 Ct.Cl. 599 (1979) (*Begay* I); *Hebah v. United States*, 197 Ct.Cl. 729, 456 F.2d 696, *cert. denied*, 409 U.S. 870, 93 S.Ct. 199, 34 L.Ed.2d 121 (1972) (*Hebah* II); *Hebah v. United States*, 192 Ct.Cl. 785, 428 F.2d 1334 (1970) (*Hebah* I); *Brown v. United States*, 32 Ct.Cl. 432 (1897) (*Brown* II); *Brown v. United States*, 32 Ct.Cl. 411 (1897) (*Brown* I).

After careful consideration of all of the matters presented to the Court by both parties in their motions, briefing, and oral arguments, the Court believes that the Government should prevail on the obsolescence issue. The Court also believes, however, that it is precluded from making that decision because of the doctrine of *stare decisis*. After carefully reading the cases cited above, this Court concludes that it is bound by the holdings pertaining to jurisdiction as enunciated by the Court of Claims in *Hebah* I, *supra*, and confirmed in *Begay* I, *supra*. Although there is an irreconcilable conflict between the holdings in *Brown* II, *supra*, and the *Hebah* and *Begay* decisions, the Court believes that the doctrine of *stare decisis* requires this Court to follow the *Hebah* and *Begay* decisions because they are later in time, speak directly to the point of jurisdiction, and *Hebah* I and II were decided by an *en banc* Court of Claims. Nevertheless, because this matter is not entirely free from doubt, this Court believes it has an obligation to explain, if it were writing on a clean slate, why it believes that the Government should prevail on its argument that the bad men treaty provisions are obsolete. In order to do this, the Court must consider the bad men treaty provision itself, the bad men cases already decided by the Court of Claims, and the arguments of the respective parties on the point.

In *Hebah* I, *supra*, the Court of Claims was dealing with an identical bad men reimbursement provision contained in the 1868 Treaty with the Eastern Band of Shoshonees and the Bannack Tribe of Indians (15 Stat. 673).[1] In that case, an Indian widow had brought a claim in the Court of Claims in 1969 alleging that a policeman on the reservation had wrongfully killed her husband and that she was entitled to reimbursement from the Government for that wrong. The Government challenged the plaintiff's right to bring action in the Court of Claims on the basis that the court would hear only tribal claims based on Indian treaties and not claims brought by individual Indians. The court, however, held that it did have jurisdiction to hear the case be-

---

1. The United States signed nine treaties with the major Indian Nations of the west during the 1867–68 timeframe. All of the treaties contained bad men treaty provisions identical to or similar to the one at issue here. Clearly, claims based on the bad men provisions of these various treaties have the potential to occur with increasing frequency in the future. The nine treaties signed in the 1867–68 timeframe are the following: Kiowas and Comanches, October 21, 1867, 15 Stat. 581; Kiowas, Commanches, and Apaches, October 21, 1867, 15 Stat. 589; Cheyenne and Arapaho, October 28, 1867, 15 Stat. 593; Sioux, April 29, 1868, 15 Stat. 635, Crow, May 7, 1868, 15 Stat. 649; Northern Cheyenne and Northern Arapaho, May 10, 1868, 15 Stat. 655; Navajo, June 1, 1868, 15 Stat. 667, Ute, March 2, 1868; 15 Stat. 619, and Eastern Band of Shoshonee and Bannack, July 3, 1868, 15 Stat. 673.

cause the bad men treaty provision specifically allowed for claims brought by individual Indians and the plaintiff was a third party beneficiary of the treaty (contract) provision. The court pointedly mentioned that no other defenses (jurisdictional impediments) were argued by the Government. The court then remanded the case to its trial division for trial on the merits. In *Hebah* II, *supra*, the commissioner (trial judge) found, after trial, that the plaintiff was not entitled to recover on the merits because the policeman had not committed a "wrong" within the meaning of the treaty. Before deciding the merits, however, the commissioner again rejected a jurisdictional argument by the Government that, among other things, raised the issue of obsolescence. The commissioner stated that to allow the Government to relitigate the jurisdictional arguments at this point would "do violence to the holdings of the court as well as to established judicial principles." *Hebah* II, *supra*, 197 Ct.Cl. at 733–34, 456 F.2d at 699. A closely divided Court of Claims thereafter adopted the findings and conclusions of the commissioner of the court.

The *Hebah* decisions were followed in 1979 (and 1980) with two decisions involving claims that were very similar in origin and scope to the case here at issue. *Begay* I and II, *supra*. In the *Begay* decisions, the court was dealing with claims by eleven Navajo female minors that claimed that, while students at an Indian boarding school on the Navajo Reservation, they had been sexually abused by male teachers and counselors. The plaintiffs based their claim on the same bad men reimbursement provision of the 1868 Treaty that is at issue here. In *Begay* I, *supra*, the Government moved to dismiss the petition because the plaintiffs had not allowed the Department of the Interior sufficient time to decide their administrative claim prior to suing in this court. The Court of Claims, however, did not believe that filing a claim seventeen days after the administrative claim was submitted, amounted to a failure to exhaust administrative remedies, especially since Interior had not decided the matter

by the time the oral argument was conducted, some fifteen months later. The Government in *Begay* I, *supra*, did not raise any other jurisdictional arguments to the court. The court then remanded the matter to the Department of the Interior to conduct an administrative hearing and to make a final decision in the matter. Some eighteen months later, the court again visited the case and found for the Government on summary judgment. The court in *Begay* II, *supra*, found that the plaintiffs had failed to exhaust their administrative remedies by failing to participate fully in the administrative hearing and procedures afforded them at the Department of the Interior. The court believed that the multiple derelections on the part of the plaintiffs amounted to a virtual failure to prosecute and thus dismissed the plaintiff's petition before the court. It is interesting to note that the court clearly found in *Begay* I and II, *supra*, that an administrative claim to the Department of the Interior was essential before the matter could be raised in the Court of Claims, and that the Department had an obligation to conduct a hearing and make a final decision.

One other case is relevant to the above discussion. In *Brown* I and II, *supra*, the court in 1897, was interpreting the bad men reimbursement provisions found in the Treaty of 1867 with the Kiowas and Comanches (15 Stat. 581). It was also attempting to determine whether the bad men provisions had been abrogated by later statutes or were still in place. At issue in the case was which procedure had to be followed by the claimants, *i.e.*, were they required to follow the bad men treaty provisions' procedure or should they follow the procedures specified in the Indian Depredation Act of 1891. 26 Stat. 851. Upon reconsideration of its decision in *Brown* I, *supra*, the court in *Brown* II, *supra*, 32 Ct.Cl. at 437–38 concluded that:

> On fuller investigation and consideration we think it must be held that both of the treaty-making parties mutually abandoned the first article so soon as it was made; that it was never treated as oblig-

atory by either of them, and that it must be regarded by the judiciary as one which almost immediately became obsolete.

In addition, the court found that various statutes, but especially the Indian Depredation Act of 1891, abrogated the earlier bad men reimbursement provisions of the 1867 Treaty.

*Brown* II, *supra,* was the decided law at the Court of Claims from 1897 through 1970, when the court decided the *Hebah* I, *supra,* case and reversed the *Brown* II, *supra,* decision. There is no indication in the *Hebah* I decision, however, that the court was made aware of the *Brown* II, precedent when it reversed that precedent.

Having considered the above discussed cases, it is now important to look at the pertinent language of the 1868 Treaty. Article I of the 1868 Treaty with the Navajos states in full:

Article I. From this day forward all war between the parties to this agreement shall forever cease. The government of the United States desires peace, and its honor is hereby pledged to keep it. The Indians desire peace, and they now pledge their honor to keep it.

If bad men among the whites, or among other people subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States will, upon proof made to the agent and forwarded to the Commissioner of Indian Affairs at Washington city, proceed at once to cause the offender to be arrested and punished according to the laws of the United States, and also to reimburse the injured persons for the loss sustained.

If bad men among the Indians shall commit a wrong or depredation upon the person or property of any one, white, black, or Indian, subject to the authority of the United States and at peace therewith, the Navajo tribe agree that they will, on proof made to their agent, and on notice by him, deliver up the wrongdoer to the United States, to be tried and punished according to its laws; and in case they wilfully refuse so to do, the person injured shall be reimbursed for his loss from the annuities or other moneys due or to become due to them under this treaty, or any others that may be made with the United States. And the President may prescribe such rules and regulations for ascertaining damages under this article as in his judgment may be proper; but no such damage shall be adjusted and paid until examined and passed upon by the Commissioner of Indian Affairs, and no one sustaining loss whilst violating, or because or his violating, the provisions of this treaty or the laws of the United States, shall be reimbursed therefor.

One of the Government's central arguments in support of its position, that the bad men reimbursement provision contained in the second paragraph of Article I is obsolete and has expired, is based on the concept that the parties intended the provision to last only as long as was necessary to help insure peace and eliminate the irritants that could cause warfare between the parties. Although it is sometimes difficult to discern what the intent of the parties was at the time the treaty was signed, courts have traditionally looked at such things as the specific language of the provision at issue, any legislative history surrounding the signing, and the contemporaneous actions of the parties to determine what the intentions were when the treaty was signed. Clearly, however, the intentions of the parties to the treaty controls the interpretation to be given to the treaty. *Northwestern Bands of Shoshone Indians v. United States,* 324 U.S. 335, 353, 65 S.Ct. 690, 699, 89 L.Ed. 985 *reh'g denied,* 325 U.S. 890, 65 S.Ct. 1552, 89 L.Ed. 1966 (1945); *United States v. Texas,* 162 U.S. 1, 36, 16 S.Ct. 725, 732, 40 L.Ed. 867 (1896). *See also* F. Cohen, Handbook of Federal Indian Law, 63, 70, 221–22 (1982 ed.).

In this particular case, the language of the treaty provision does not state how long the provision was to last. Although other provisions of the treaty specifically

stated that the provision was to last "not less than 10 years" (Article VI), for three years (Article VII), for 10 years (Article VIII), Article I contained no language on the point. Nevertheless, the Government makes a good point when it suggests that the treaty was made during an era of warfare between the Indian tribes in the west on the one hand and the white immigrant settlers and the Government on the other. Clearly Article I was designed to bring about peace. The first paragraph of Article I makes that indelibly clear.

Article I. From this day forward all war between the parties to this agreement shall forever cease. The government of the United States desires peace, and its honor is hereby pledged to keep it. The Indians desire peace, and they now pledge their honor to keep it.

This being true, it is not at all inappropriate for the Government to suggest that when warfare had become a thing of the past, the provisions to ensure the peace were no longer necessary to keep in place and that the parties understood that intuitively at the time. The fact that such an understanding was not written into the treaty was not unusual under the factual circumstances. When one is in the middle of constant warfare and strife, it is a bit difficult to visualize and articulate what peace would be like and when it could be achieved.

Although the language of the treaty is illuminating, unfortunately, the legislative history surrounding the signing of the treaty was not very helpful. However, we do know that Congress, by Act of July 20, 1867, 15 Stat. 17, created the Indian Peace Commission composed of civilians and army officers who were appointed to "investigate the cause of the war and arrange for peace." It was this Commission that concluded the nine treaties in late 1867 and 1868, including the treaty with the Navajos. *See* footnote 1. All of these nine treaties had identical or similar provisions to Article I in the Navajo treaty.

The actions of the parties after the treaty was signed are somewhat helpful, however, to a resolution of this matter. After the treaty was signed, none of the reimbursement provisions were ever utilized by any of the parties to the nine treaties. No Government regulations were ever promulgated in the 100 years following the treaty's ratification by the U.S. Senate. The United States never asked the tribes to deliver up a wrongdoer. Article I was never treated as an obligation by either party. This contemporaneous treatment of the treaty provision by both parties is what persuaded the Court of Claims in *Brown II, supra,* 32 Ct.Cl. at 438, to declare that Article I of these treaties had become obsolete. In that case, the Court of Claims found that the similar Article I provision had never been implemented by either party, had been abandoned by both parties, and had thus become obsolete.

Other cases also have found that treaty provisions do expire after a reasonable time.

In *Sioux Tribe of Indians v. United States,* 86 Ct.Cl. 299, 307 (1938), *cert. denied,* 306 U.S. 642, 59 S.Ct. 582, 83 L.Ed. 1042 (1939), the Court of Claims concluded that, if consistent with the intentions of the parties, an Indian treaty obligation of the United States could expire within a reasonable time after the purpose for which it was adopted has been accomplished. The court based this decision in part on the fact that this interpretation was consistent with the understanding by the Government. *See also Sioux Tribe of Indians v. United States,* 89 Ct.Cl. 31, 38 (1939); *Navajo Tribe of Indians v. United States,* 224 Ct.Cl. 171, 198, 624 F.2d 981, 995 (1980) (holding that the treaty obligation to provide educational benefits did not continue beyond ten years). Likewise in *Sioux Tribe of Indians v. United States,* 6 Cl.Ct. 91, 95–96 (1984), this Court held that treaty obligations contained in the 1868 Sioux treaty to provide agricultural and instructional expenditures could be limited to a reasonable time. This view was based in part on the fact that later legislation imposed new responsibilities on the Government. *See also United States v. Consol-*

*idated Wounded Knee Cases,* 389 F.Supp. 235 (D.Neb. and D.S.D.1975), *aff'd in part, rev'd in part sub nom. United States v. Dodge,* 538 F.2d 770 (8th Cir.1976), *cert. denied sub nom. Cooper v. United States,* 429 U.S. 1099, 97 S.Ct. 1118, 51 L.Ed.2d 547, *reh'g denied,* 431 U.S.. 909, 97 S.Ct. 1708, 52 L.Ed.2d 395 (1977).

Based on all of the above, the Court believes that the Government has made a strong case for finding that the bad men reimbursement provisions contained in Article I of the treaty have expired or have been abandoned by the parties.

Although the Government has not argued that the bad men provisions have been abrogated by later passed statutes, it is clear that Congress has passed enumerable laws affecting the peace, health, and welfare of the various Indian tribes since the treaties at issue were ratified. It also appears to this Court that at least one decision of the Court of Claims, again, *Brown* II, *supra,* 32 Ct.Cl. at 439, held that the reimbursement provisions were in fact abrogated by the later passed Indian Depredation Act of 1891, 26 Stat. 851. In any event, it is unnecessary for the Court to have to find that there has been an abrogation consistent with the standards enunciated by the recent Supreme Court case of *United States v. Dion,* —— U.S. ——, 106 S.Ct. 2216, 90 L.Ed.2d 767 (1986), for the Court to find that the Government's position on abandonment and obsolescence is strong.

What is important, however, is to note that many of the later passed statutes provide far greater protection from wrongs to Indians (and all other citizens of the United States) than what was provided for them by the bad men treaty provisions. Also, the new statutes passed since the 1870's reflect the peace and civilization that has matured since then. When the treaties were signed, there were, in effect, very few laws of civilization in place in the west. The States of New Mexico and Arizona were not even states until some 50 years later. It was critical for the parties to agree in 1868 to keep the peace and provide

a remedy for wrongdoing on both sides because no Governmental or other entity existed to do so. Consequently, as time passed, the Congress passed statutes that reflected the increased civilization of the west and provided the protection that supplanted the bad men reimbursement provisions. For example, Congress, by Act of March 3, 1871, 16 Stat. 544, 566, codified at 25 U.S.C. § 71, decreed that no Indian nations would be recognized any longer as independent nations. In 1924, by Act of June 2, 1924, 43 Stat. 253, Congress naturalized all Indians as full citizens of the United States (those that had not already become citizens via other statutory or treaty routes). In 1948, Congress enacted the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.,* which gave all citizens the right to sue the United States for torts (wrongs) committed by instrumentalities of the United States Government. In addition to these examples of laws passed by Congress that supplanted the need for the Indians to retain their bad men reimbursement provisions, the civil and criminal courts of the United States and the various states of the union are open to all citizens (including Indians) to vindicate societal wrongs.

■ In short, it is clear that Indian citizens, such as the plaintiff here, have many legal options open and available to them to vindicate "wrongs" that may have been committed against them. The need to have the bad men reimbursement provisions available to Indians covered by these 1867 and 1868 treaties simply no longer exists. This being true, and consistent with the Government's established arguments regarding abandonment and obsolescence, the Court would conclude, if it were free to do so, that the bad men reimbursement provisions contained in Article I of the 1868 treaty with the Navajos are obsolete and abandoned, and thus provide no statutory/contractual basis for jurisdiction in this Court. *United States v. Testan,* 424 U.S. 392, 400, 96 S.Ct. 948, 954, 47 L.Ed.2d 114 (1976). The Court hastens to add, however, that it believes it is bound by the decisions of the Court of Claims in *Hebah* I

and II, *supra,* and *Begay* I and II, *supra,* and the doctrine of *stare decisis,* and therefore, concludes that this Court does have jurisdiction to review the Department of the Interior's administrative decision in regard to the plaintiff's bad men reimbursement claim.

## B. Other Government Arguments

### 1. Statute of Limitations

█ The Government contends here that the "wrong" the plaintiff is alleging in this case is a tort and thus, must have been filed in this Court within two years after it occurred, pursuant to 28 U.S.C. § 2401(b) (1982). Since the plaintiff filed this case in the Claims Court some five years and eleven months after the alleged incident, the Government asserts that the two-year statute of limitations precludes this Court from assuming jurisdiction over this claim.

Unfortunately for the defendant, however, this argument totally misses the mark. To begin with, this Court does not have tort jurisdiction at all. The Tucker Act, 28 U.S.C. § 1491(a) (1982) clearly so states. More to the point, however, is the fact that this is a claim for an alleged "wrong" submitted under the authority of an Indian treaty. An Indian treaty, which has been ratified by the U.S. Senate, and proclaimed by the President of the United States is the law of the land, that is, the equivalent of a statute of the United States. Any claim made under this treaty, then, is more in the nature of a claim based on contract rather than tort principles. Indeed, in *Hebah* I, *supra,* 192 Ct.Cl. at 791–92, 428 F.2d at 1338–39, the Court of Claims found that the claimant in that case was appropriately invoking her third-party beneficiary *contract* rights in bringing her claim to the Court. Since the instant claim is contractual in nature and brought pursuant to a treaty provision that can be fairly read to mandate compensation, the case has been appropriately brought within the normal six-year statute of limitations contained in 28 U.S.C. § 2501 (1982). *See also* 28 U.S.C. § 2401(a) (1982).

### 2. Laches

The Government next argues that, even if the tort statute of limitations is not to be applied, the plaintiff should be precluded from presenting her case in this Court by the equitable doctrine of laches.

Laches is a "fairness" doctrine by which relief is denied to one who has unreasonably and inexcusably delayed in the assertion of a claim. Failure to act promptly will operate as a bar to recovery where the delay results in injury or prejudice to the adverse party. The doctrine of laches is based upon considerations of public policy, which require, for the peace of society, the discouragement of stale demands. It recognizes the need for speedy vindication or enforcement of rights, so that courts may arrive at safe conclusions as to the truth. As an equitable defense, laches is applied apart from, and irrespective of, any statutes of limitations. *See Deering v. United States,* 223 Ct.Cl. 342, 347, 620 F.2d 242, 244 (1980); *Brundage v. United States,* 205 Ct.Cl. 502, 504 F.2d 1382 (1974), *cert. denied,* 421 U.S. 998, 95 S.Ct. 2395, 44 L.Ed.2d 665 (1975).

The problem with the Government's laches defense is two-fold. First of all, laches is a doctrine that this Court has commonly applied in civilian and military pay cases. *Bunge Corp. v. United States,* 5 Cl.Ct. 511 (1984), *aff'd,* 765 F.2d 162 (Fed.Cir.1985). It has not, however, been commonly applied in contract cases. *See Tuftco Corp. v. United States,* 222 Ct.Cl. 277, 288, 614 F.2d 740, 746 (1980); *but see S.E.R., Jobs for Progress, Inc. v. United States,* 759 F.2d 1, 5 (Fed.Cir.1985); *Lacoste v. United States,* 9 Cl.Ct. 313, *appeal dismissed,* No. 86–1002 (Fed.Cir. June 13, 1986). It has rarely, if ever, been used in Indian claim cases. *County of Oneida v. Oneida Indian Nation,* 470 U.S. 226, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985).

█ Quite apart from this precedent, however, if the doctrine were for application in this case, the Government would have to convince this Court that the plaintiff delayed excessively and inexcusably in filing this action, and that the delay severe-

ly prejudiced the defendant. This the defendant cannot do. Although the plaintiff did not find her way to the Court until some five plus years had elapsed since the alleged incident, she nevertheless had been pursuing her administrative remedies with some diligence. She complained to an official at the Shiprock hospital within two days of the alleged incident. She then brought the matter to the attention of the U.S. Attorney's office in New Mexico. She also filed an administrative claim under the Federal Tort Claims Act within eighteen months of the alleged incident. Finally, in July of 1982, she filed her administrative claim under Article I of the Treaty of 1868 with the Department of the Interior. Some eighteen months later, Interior denied her administrative claim, and she filed for judicial review in this Court within the six-year statute of limitations. This does not appear to the Court to be "excessive or inexcusable delay" under the factual circumstances here present.

Moreover, the defendant has not shown how they are severely prejudiced by the delay. The Government had an opportunity to investigate this matter on several different occasions, starting two days after the alleged incident, when the plaintiff first complained to a senior official at the Shiprock hospital. Also, not once has the Government categorically stated that Mr. Freeman cannot be located or that any of the other critical witnesses are otherwise unavailable or cannot be located because of the delay.

In view of the above discussion, then, this Court does not agree with the defendant that the doctrine of laches is for application in this case.

### 3. Self-execution of treaty provision

█ The Government's argument here is that the bad men reimbursement provision in the treaty is not self-executing and must, therefore, be "implemented" by further congressional action before any reimbursement can be paid by the Government pursuant to the provision. Since Congress has never passed any "implementing" legislation in this regard, there is no statute fairly mandating compensation, and thus no basis for the plaintiff's action in this Court. The Government supports the position by pointing to Article I, Section 9, Clause 7 of the United States Constitution which states:

No money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law; and a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time.

The Government appears somewhat confused, however, as to whether its argument is bottomed on a failure of the Congress to pass further basic *authority* legislation or whether the argument is based on a failure to pass further *appropriation* legislation. In either case, however, the Court does not believe the Government's argument is correct.

To begin with, the precedent in this Court is against the Government's position.[2] The Court of Claims in *Hebah* I, *supra*, and *Begay* I, *supra*, specifically found jurisdiction to decide a claim by an individual Indian under the identical bad men reimbursement provision. Although the precise argument was apparently not raised in either case, it is clear that the Court found in the reimbursement provision of the treaty, a sufficient statutory basis to sustain an action under the Tucker Act in the Court of Claims. By implication, it is clear that the Court believed that the reimbursement provision was self-executing and that no further impediment existed to its authority to issue a money judgment in the event the facts of the cases warranted that action.

Secondly, even if the *Hebah* and *Begay* decisions do not put this matter to rest, other legal arguments do. For instance, the defendant has failed to bolster its argument by citing this Court to any credible

---

**2.** Under General Order No. 1, U.S. Cl.Ct. Preceding Rule 1, 28 U.S.C.; *South Louisiana Grain Service, Inc. v. United States,* 1 Cl.Ct. 281, 287 (1982); *South Corp. v. United States,* 690 F.2d 1368 (Fed.Cir.1982), this Court is bound by the precedents established by the Court of Claims.

case that is based on an Indian treaty. There simply is a huge dirth of support for the Government's argument. The one Indian case it does cite would support the plaintiff's position that the provision at issue was self-executing and understood as such by the parties. In *Leighton v. United States*, 29 Ct.Cl. 288, 307 (1894) the court stated:

> "A treaty is primarily a compact between independent nations," and our Constitution declares "this Constitution and the laws made in pursuance thereof, and all treaties made or which shall be made under authority of the United States, shall be the supreme law of the land." And no distinction is there made between a treaty with a foreign nation and with an Indian tribe. A treaty with an Indian tribe, therefore, is "a law of the land, as an act of Congress is," and where such treaty prescribes a rule by which private rights can be determined, the court will resort to such rule; otherwise the court must look to the legislation of Congress for the enforcement of its provisions. (*Head Money Cases*, 112 U.S., 580, 598.)

The other cases the Government cites are all treaties between the United States and foreign countries and it is readily apparent that the provisions at issue were not self-executing and required further congressional action before they could be considered the law of the land.

The plaintiff, on the other hand, has presented a cogent case to this Court that Indian treaties are virtually always self-executing in nature. Although the matter has only infrequently been considered by the courts; in those instances where it has been, the treaty has been held to be self-executing. *See Francis v. Francis*, 203 U.S. 233, 27 S.Ct. 129, 51 L.Ed. 165 (1906); *Jones v. Meehan*, 175 U.S. 1, 20 S.Ct. 1, 44 L.Ed. 49 (1899); *Ward v. Race Horse*, 163 U.S. 504, 16 S.Ct. 1076, 41 L.Ed. 244 (1896); *United States v. Forty-Three Gallons of Whiskey*, 3 Otto 188, 93 U.S. 188, 23 L.Ed. 846 (1876). The Government has simply failed to counter the plaintiff's cogent ar-

gument that no case has ever held an Indian treaty to be non-self-executing.

Third, this Court finds plaintiff's argument persuasive that treaties which confer individual rights and read like statutes are found to be self-executing.

> One of the basic and more objective tests used to determine if a treaty is binding on the judiciary is whether its provisions can be given effect without legislation. This approach examines the adequacy of the treaty's provision for reaching the desired end. Accordingly, the courts have looked to see if the treaty includes the necessary rules and details to read like a statute. If the provisions are adequate the courts may find the parties intended to prescribe a rule which standing alone would be enforceable in the courts.

Comment, *Criteria for Self-Executing Treaties*, 1968 U.Ill.L.F. 238, 239–40.

The language of the treaty provision, Article I, paragraph two, along with other provisions of the treaty, referred to, *infra*, sufficiently reads like a statute so as to meet this test.

In addition to the above, Article VI, Clause 2 of the United States Constitution is absolute and does not help the defendant's argument; it contains no requirement that a treaty be implemented by further legislation. The clause reads as follows:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

A treaty then, when ratified by the U.S. Senate and proclaimed by the President of the United States, as this treaty was, is the law of the land, and by implication needs no further basic authority legislation to implement its provisions.

Whether the reimbursement provision requires further congressional action in the

form of an implementing appropriation act is really another matter entirely and one that this Court need not answer. It need not answer this because it believes that if any further implementing appropriation legislation is needed, the Congress could still enact it or perhaps more to the point, has already enacted it. Here, the Court simply points to 28 U.S.C. § 2517 (1982) (its payment of judgments provision) and to 31 U.S.C. § 1304(a)(3)(A) (1982) (which automatically appropriates money for judgments rendered by the Claims Court), and their forerunning statutes.

For all of the above reasons, then, this Court believes the bad men reimbursement provision to be self-executing, and the Government's arguments to the contrary to be incorrect.

### 4. Judicial Review

The Government's final argument in support of its motion to dismiss or, in the alternative, for summary judgment is based on its view that Article IV of the treaty specifically precludes any judicial review of the Assistant Secretary of Interior for Indian Affairs' final administrative decision in this case. The Government contends that Article IV clearly provides the administrative procedures to be followed for claims both by Indians against bad men and by whites and others against bad Indians that are contained in the second and third paragraphs of Article I of the treaty, respectively. The Government points to the language used in the last sentence of Article IV which says that the Assistant Secretary's "decision shall be binding on the parties to the treaty."

In response, the plaintiff argues that Article IV's "binding on the parties" language is not applicable to claims for "wrongs" by Indians against bad men contained in the second paragraph of Article I, but is only applicable to claims by whites and others against bad Indians for depredations made pursuant to paragraph three of Article I. The plaintiff bases her argument on the fact that the last sentence of Article IV only uses the term "depreda-

tions" and does not include the term "wrongs." In addition, plaintiff cites *Hebah* I, *supra,* which found that if plaintiff had made proof of her claim to the agent and forwarded that proof to the Commissioner of Indian Affairs, she had exhausted her administrative remedies and was entitled to a trial *de novo* in this Court. Thus, the plaintiff argues here that she is entitled to a trial *de novo* on her claim before this Court, but in any event, and at the very least, she is entitled to judicial review of the Assistant Secretary's final administrative decision.

██ Although this Court does not agree with the plaintiff's position that she is entitled to a trial *de novo* in this Court (discussed more fully in Section C *infra*), the Court does agree that the plaintiff is entitled to judicial review of the Assistant Secretary's final administrative decision (although not necessarily for the reasons plaintiff articulates). After reviewing the treaty provisions and the appropriate case precedents, this Court concludes that Article IV does not preclude judicial review of the Assistant Secretary's final administrative decision rendered January 30, 1984.

Article IV of the treaty states:

Article IV. The United States agrees that the agent for the Navajos shall make his home at the agency building; that he shall reside among them, and shall keep an office open at all times for the purpose of prompt and diligent inquiry into such matters of complaint *by or against the Indians* as may be presented for investigation, as also for the faithful discharge of other duties enjoined by law. In all cases of depredation on person or property he shall cause the evidence to be taken in writing and forwarded, together with his finding, *to the Commissioner of Indian Affairs, whose decision shall be binding on the parties to this treaty.* [Emphasis added.]

It is quite clear to the Court that Article IV was designed and intended by the parties to provide the administrative procedures to be followed when a claim by or against an

Indian was filed under Article I of the treaty. The Court believes this is true regardless of whether the claim could be characterized as a "wrong" or a "depredation."

In addition, the mere fact that the last sentence in Article IV states that the Assistant Secretary's administrative decision "shall be binding on the parties" does not preclude judicial review of that decision. Courts have traditionally been reluctant to preclude parties from such judicial review when they allege they have been the subject of illegal or arbitrary and capricious administrative action. *Lindahl v. Office of Personnel Management,* 470 U.S. 768, 105 S.Ct. 1620, 84 L.Ed.2d 674 (1985); *Dunlop v. Bachowski,* 421 U.S. 560, 566, 95 S.Ct. 1851, 1857, 44 L.Ed.2d 377 (1975); *Sanders v. United States,* 219 Ct.Cl. 285, 299–300, 594 F.2d 804, 812 (1979). Only in those circumstances where the court is shown "clear and convincing evidence" of a contrary legislative (or treaty) intent should the courts restrict access to judicial review. *Abbott Laboratories v. Gardner,* 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967). *Fausto v. United States,* 783 F.2d 1020, 1022, *reh'g denied,* 791 F.2d 1554 (Fed.Cir.1986). In this case, the Government has not shown any intent on the part of the parties to this treaty to preclude judicial review. The language contained in the last sentence of Article IV simply does not go far enough to overcome the strong presumption in favor of judicial review.

In addition to the above general case precedent, the Court of Claims has clearly addressed this jurisdictional issue in both the *Hebah* I, *supra,* and *Begay* I, *supra,* decisions. *Begay* I, *supra,* in particular, discussed at length the fact that there must first be an administrative decision by the Department of the Interior, pursuant to the treaty, but that there clearly was a right on the part of an Indian claimant to seek judicial review of that administrative decision in the Court of Claims. Based on the precedent established in those cases, but especially on *Begay* I, *supra,* there simply is no more room for argument on this point. The Claims Court has jurisdiction to review a final administrative decision of the Assistant Secretary of Interior for Indian Affairs in an Indian bad men reimbursement provision case.

### C. Summary and Remand

As earlier discussed in this opinion, if this Court were writing on a clean slate, it would find that the Government is correct in its argument that the bad men reimbursement provision contained in Article I of the treaty is obsolete and has been abandoned. However, the Court believes that the matter is controlled by the doctrine of *stare decisis,* and that this Court is thus precluded from so deciding by the decisions of the United States Court of Claims in *Hebah* I and II, *supra,* and *Begay* I and II, *supra.* The defendant's four other arguments offered in support of its motion to dismiss or, in the alternative, for summary judgment (statute of limitations, laches, non-self-execution, and preclusion of judicial review) as already indicated are not persuasive. Therefore, it is concluded that this Court does have jurisdiction to review the Assistant Secretary of Interior for Indian Affairs' final administrative decision.

One final matter must be resolved at this point. It is the question of whether the plaintiff is entitled to a trial *de novo* in this Court, or whether the matter should be remanded to the Department of the Interior for an administrative decision on the merits by the Assistant Secretary prior to any further review by this Court. Since the administrative decision of January 30, 1984 found that the bad men treaty provision had become obsolete thereby precluding any jurisdiction in the Department of the Interior to hear the claim, the plaintiff still has not had a final administrative decision on the merits of her claim. It is important to note, however, that the plaintiff has not at any time, argued that she cannot get a fair and impartial administrative decision on the merits at Interior, which would thereby render her administrative remedy inadequate at the Department of the Interior.

In view of the above discussion, then, and taking into account the decisions of the Court of Claims in *Hebah* I and II, *supra,* and *Begay* I and II, *supra,* this Court believes that the matter should be remanded to the Assistant Secretary of Interior for Indian Affairs at the Department of the Interior for a final decision of the plaintiff's claim on the merits.

It believes this is the appropriate procedure to follow because Article IV of the treaty clearly calls for an administrative decision on the merits, and the *Begay* I, *supra,* decision supports that procedure.

Although the *Hebah* I, *supra,* decision would seemingly argue for the trial *de novo* in this Court, this Court believes that *Begay* I, *supra,* is the decision that should be followed. *Begay* I, *supra,* should be followed because it is later in time, deals with precisely the same treaty provision as this case (Treaty of 1868 with the Navajos), and it discusses in depth the appropriate administrative and judicial procedures to follow. In addition to the procedures, the *Begay* I, *supra,* decision advises as to the appropriate standard of review for a reviewing court to follow, *i.e.,* a review based on the substantial evidence standard.

For all of the above reasons, this Court concludes and decides that the Assistant Secretary of Interior for Indians Affairs' decision of January 10, 1984, was legally erroneous and is thus reversed. The matter is remanded to the Department of the Interior (the Assistant Secretary of Interior for Indian Affairs) for a final administrative decision on the merits of the plaintiff's bad men reimbursement claim.

## CONCLUSION

For the foregoing reasons, the defendant's motion to dismiss or, in the alternative, for summary judgment is denied.

In addition, the following matters are decided and ordered:

(1) The Assistant Secretary of Interior for Indian Affairs' decision of January 10, 1984, was legally erroneous and is thus reversed;

(2) The plaintiff's bad men reimbursement claim is remanded to the Department of the Interior (the Assistant Secretary of Interior for Indian Affairs) for a final administrative decision on the merits;

(3) The Assistant Secretary of Interior for Indian Affairs shall issue its final administrative decision in this matter within 180 days of the date of this order and that period will not be extended except for truly extraordinary circumstances. This remand is entered pursuant to Rule 60.1 of the U.S. Claims Court, and the clerk and the parties are directed to take the appropriate action as delineated thereunder;

(4) The Court further concludes and states, pursuant to 28 U.S.C. § 1292(d)(2), as amended by section 125(b) of the Federal Courts Improvement Act of 1982 (Pub.L. No. 97–164, 96 Stat. 25, 37), that there is involved in this interlocutory order a controlling question of law (Section A) with respect to which there is a substantial ground for difference of opinion and that an immediate appeal of this opinion may materially advance the ultimate termination of the litigation.